# FILED

MAY 0 4 2010

PATRICK E. DUFFY, CLERK

By_____
DEPUTY CLERK, MISSOULA

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

## MISSOULA DIVISION

ROCK CREEK ALLIANCE; CLARK )
FORK COALITION; CABINET )
RESOURCE GROUP; MONTANA )      CV 05-107-M-DWM
WILDERNESS ASSOCIATION; )      CV 08-028-M-DWM
EARTHWORKS; and ALLIANCE )     (consolidated)
FOR THE WILD ROCKIES, )
)
      Plaintiffs, )
)      OPINION
)
      vs. )
)
UNITED STATES FOREST SERVICE; )
U.S. DEPARTMENT OF )
AGRICULTURE; TOM TIDWELL, in his )
official capacity as Regional Forester for )
the Northern Region; PAUL BRADFORD, )
in his official capacity as Forest Supervisor )
of the Kootenai National Forest; and )
ED SCHAFER, in his official capacity as )
Secretary of the U.S. Department of )
Agriculture, )
)
      Defendants, )



<table>
<tr><td></td><td>)</td></tr>
<tr><td>and,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>REVETT SILVER COMPANY,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Defendant-Intervenor.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
</table>

```
                                       )
        and,                           )
                                       )
REVETT SILVER COMPANY,                 )
                                       )
        Defendant-Intervenor.          )
                                       )
                                       )
_____)
                                       )
ROCK CREEK ALLIANCE, CABINET           )
RESOURCE GROUP, SIERRA CLUB,           )
EARTHWORKS, ALLIANCE FOR THE           )
WILD ROCKIES, NATURAL                  )
RESOURCES DEFENSE COUNCIL,             )
TROUT UNLIMITED, IDAHO COUNCIL         )
OF TROUT UNLIMITED, PACIFIC            )
RIVERS COUNCIL, and GREAT OLD          )
BROADS FOR WILDERNESS,                 )
                                       )
        Plaintiffs,                    )
                                       )
    vs.                                )
                                       )
UNITED STATES FISH & WILDLIFE          )
SERVICE,                               )
                                       )
        Defendant,                     )
                                       )
        and,                           )
                                       )
REVETT SILVER COMPANY,                 )
                                       )
        Defendant-Intervenor.          )
```

## I.  Introduction

The Plaintiffs in these consolidated environmental record review cases are a

coalition of environmental advocacy groups led by the Rock Creek Alliance. They

seek review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-

706, of federal agency actions and the associated planning documents relating to

the approval of the Revett Silver Company's proposed mining operation near

Rock Creek and the Clark Fork River in the Cabinet Mountain Wilderness on the

Kootenai National Forest. The lead case, CV 05-107-M-DWM, names the United

States Forest Service as the principal Defendant and advances claims under the

Endangered Species Act ("ESA") (Counts I and II[1]), the National Environmental

Policy Act ("NEPA") (Count III), the Clean Water Act and the Forest Service

Organic Administration Act of 1897 (the "Organic Act") (Count IV), and the

National Forest Management Act ("NFMA") (Count VI).[2] The planning

documents challenged under the lead case are the 2001 Final Environmental

Impact Statement, the 2003 Record of Decision, the Plan of Operations, the 2007

---

[1]Count II of the Amended Complaint in the lead case (Doc. No. 52) is a claim under Section 9 of the ESA alleging unlawful take by the Forest Service of ESA-listed grizzly bears and bull trout due to the Forest Service's reliance on an invalid biological opinion. The Plaintiffs do not mention their Section 9 claim in any of their six summary judgment briefs filed in these consolidated cases; it is assumed that they intend to rely on their argument that the relevant biological opinion is invalid under Section 7 of the ESA, expecting that if the Court finds the biological opinion invalid, it will take the next step and conclude that the Forest Service's actions will result in unauthorized take under Section 9.

[2]The Amended Complaint in the lead case alleges six claims, but contains an error in the numbering. The final two claims in sequence are both numbered Count V. See Doc. No. 52 at 33-34. For purposes of this document, the final claim (the NFMA claim) is referred to as Count VI. The Plaintiffs have abandoned Count V, which raised claims under the Organic Act and the Surface Resources Act of 1955. See Doc. No. 70.

Determination Letter from Forest Supervisor Paul Bradford to Revett, and the

three Supplemental Information Reports issued by the Forest Service in 2007.

Revett is a permissive intervenor in the lead case.  <u>See</u> Doc. No. 25.

The companion case, CV 08-28-M-DWM, also features the Rock Creek

Alliance as the lead Plaintiff.  The companion case alleges only ESA Section 7

claims and names the Fish and Wildlife Service as the Defendant.  While there are

ESA claims alleged in the lead case, it is through the companion case that the

Plaintiffs launch their challenge to the Fish and Wildlife Service's "no jeopardy"

findings with regard to ESA-listed grizzly bears and bull trout.  Count I of the

Complaint in the companion case alleges an ESA Section 7 claim relating to

grizzly bears, while Count II alleges a similar claim relating to bull trout.  The

planning documents challenged in the companion case are the 2006 Biological

Opinion and 2007 Supplement issued by the Fish and Wildlife Service.  Revett

was allowed to intervene as a matter of right in the companion case.  <u>See</u> Doc. No.

16 in CV 08-28-M-DWM.

In both cases, the Plaintiffs ask the Court to declare that the agencies have

violated the relevant statutes and to enjoin them from authorizing any activity

relating to the mine until they have complied with all applicable statutes and

regulations.  Plaintiffs also seek an award of reasonable fees, costs, and expenses,

including attorney's fees.  The cases are ripe for resolution on all parties' cross-

motions for summary judgment.[3]

The Court heard oral argument on the pending summary judgment motions at a hearing on March 17, 2010, and issued a dispositive Order on March 29, 2010. This opinion sets forth the Court's reasoning.

## II.  Background

### A.    The Rock Creek Mine Project

The Rock Creek Mine Project is a proposed underground copper and silver mine located near Noxon, Montana, on 1,560 acres consisting of 749 acres of private land and 811 acres of national forest lands within the Rock Creek drainage. 05-107 AR 91A-2 at 2-3.[4]  The projected "potential area of disturbance" covers 482 acres, including 140 acres of national forest lands.  Id. at 3.  The project will involve construction of a preliminary evaluation adit, followed by an underground copper and silver mine, a mill/concentrator complex, water lines, waste lines, power lines, a tailings paste plant and storage facility, a wastewater treatment

---

[3]The Court's Order consolidating the cases (Doc. No. 61) largely failed to achieve its desired effect.  The Plaintiffs and Revett apparently interpreted the lack of explicit instructions limiting the parties to a single brief as an invitation for each of them to file two motions for summary judgment supported by separate briefs, each containing the maximum number of pages allowed under then-applicable Local Rule.  The Federal Defendants followed the spirit of the Order rather than exploiting its letter, and filed a single motion for summary judgment and accompanying brief.  The result is a total of 16 briefs in the case, many of which heavily incorporate citations and argument from the associated statements of uncontroverted facts and statements of genuine issues, constituting hundreds of pages of legal argument and supporting materials.

[4]Citations to the administrative record in the lead case are in the following format: 05-107 AR [notebook number]-[document number] at [page number].

facility, and a railroad loadout facility.  Id. at 7-9.  The planned mine is to be

constructed using the "room-and-pillar" method, whereby pillars of ore will be left

intact to support the rock ceiling above a mined room.  Id. at 9.  The planned life

span of the mine, from evaluation to reclamation, is 30 to 37 years.  Id. at 3.  The

stated purpose and need for the project is to "construct, operate, and reclaim all

facilities necessary to mine, remove and transport economically mineable minerals

from the Rock Creek deposit."  Id. at 1.

Revett owns 99 patented lode mining claims covering 1,686 acres within

and 123 acres adjacent to the Cabinet Mountain Wilderness.  05-107 AR 91A-2 at

2.  Revett also holds 189 unpatented lode mining and mill site claims and/or tunnel

site claims and owns 754 acres of private land within the project area.  Id. at 10.

These claims were acquired by Revett (formerly Sterling Mining Company) from

ASARCO, which had earlier acquired the property rights from original holder

Bear Creek Mining Company.  05-107 AR 88-2 at 1-3.  The ore reserves that

Revett has proposed to mine under the Rock Creek Project are contained in the

company's 99 patented claims.  05-107 AR 91A-2 at 10.

The mine project has been approved to take place in two phases.  Phase I

consists of the construction of an evaluation adit; Phase II would involve

construction of the mine and related facilities, and later reclamation.  05-107 AR

91A-2 at 6-7.  The planned evaluation adit is a 6,700 foot-long shaft measuring 20

feet high by 16 to 18 feet wide and requiring 18 to 24 months to complete.  05-107
AR 130-27 at 2-4, 2-9.  The purpose of the evaluation adit is to gather information
about the orebody as well as data on ground water quality and water flow,
geochemical data, and rock mechanics data.  05-107 AR 91A-2 at 7.  During Phase
I, support facilities would be constructed both at the adit site and several miles off-
site on Revett-owned land.  Facilities proposed for the adit site include a
temporary steel shop building, two propane generators, and an above-ground
propane tank.  05-107 AR 88-2 at 2-98.  Construction on Revett's land would
include office trailers, a garage and warehouse, a water treatment facility, lined
ponds, an employee parking lot, and a 500-gallon above-ground fuel tank.  05-107
AR 130-27 at 2-4, 2-7; 05-107 AR 88-2 at 2-95 to 2-100.  The adit would be
accessed by existing roads and employ a maximum of 45 workers.  05-107 AR
130-27 at 2-4.  The evaluation adit is expected to disturb 8.3 acres of land.  05-107
AR 88-2 at 2-98.

Phase II, the construction and operation of the mine, may not begin until
after the evaluation adit is complete and Revett has submitted relevant empirical
data to the Forest Service and updated its Plan of Operations accordingly.  05-107
AR 91A-2 at 8.  Before going forward with Phase II, Revett must submit and
receive agency approval of modified and/or updated reclamation and monitoring
provisions for its Plan of Operations.  Id.  The company must also submit a

reclamation performance bond and final design and mitigation plans to be implemented during mine construction.  Id.  The Record of Decision calls for the responsible agencies to conduct a technical panel review of the information obtained during the evaluation adit to determine if the data is consistent with conclusions reached in the Final Environmental Impact Statement, and to order any additional studies that the agencies deem necessary.  Id.  Revett must also implement reasonable and prudent mitigation and conservation measures and adhere to terms and conditions contained in the 2006 Biological Opinion and 2007 Supplement, and must implement all mitigation and modifications outlined in Alternative V of the Final Environmental Impact Statement and the Record of Decision.  Id.

Revett's myriad obligations to take future action based on the information obtained from the evaluation adit substantiate that the Forest Service's 2003 Record of Decision is not the final step in agency approval of Phase II.  The Record of Decision states:

> The agencies have determined the information collected to date is adequate and do not expect any new circumstances or different results from future monitoring data.  If agencies' review of the evaluation adit information leads them to determine there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts, the agencies will conduct an appropriate level of supplemental analysis before [Revett] will be allowed to proceed with constructing the mine, mill, and all other associated facilities.

05-107 AR 91A-2 at 8.

Before it can act Revett must receive written permission from the agencies to proceed with Phase II of the Mine project.  Id.  Appendix K to the Final Environmental Impact Statement specifies that approval of Phase II is not a foregone conclusion, stating, "It is conceivable that a temporary or permanent shutdown of operations could occur from permit compliance situations requiring enforcement and violation abatement actions, such as failure to adhere to mine rock sampling and testing protocol, or improper implementation of approved mitigations where needed."  05-107 AR 89-1 at K-6.  Elsewhere the Final Environmental Impact Statement says the following in describing the Acid Rock Drainage and Metals Leaching Plan contained in Appendix K: "This plan includes provisions for waste rock handling during adit construction as well as contingency needs should premature project closure occur before mine construction and development begins."  05-107 AR 88-2 at 2-100.

**B.    Federal Agency Planning and Review**

ASARCO, Revett's predecessor, began the application process for the Rock Creek Mine Project on May 6, 1987.  The Forest Service and the Montana Department of Environmental Quality ("Montana DEQ") issued a Draft Environmental Impact Statement for the project in 1995.  05-107 AR 85.  The same agencies produced a Supplemental Draft Environmental Impact Statement in

1998.  05-107 AR 86, 87.  The Final Environmental Impact Statement was issued in September 2001.  05-107 AR 91A-2 at 3.  In preparing the 2001 Final Environmental Impact Statement the Forest Service consulted with the Fish and Wildlife Service; the Environmental Protection Agency; the Army Corps of Engineers; the Montana Department of Fish, Wildlife and Parks; the Montana Department of Transportation; the Montana Hard Rock Mining Impact Board; Sanders County; and Lincoln County.  Id. at 15-18.

The 2001 Final Environmental Impact Statement considered five alternatives in detail:

**Alternative I** – No action; the project would be denied or bought out by public agencies.

**Alternative II** – Revett's proposed plan.

**Alternative III** – Revett's proposed plan with agency-initiated modifications and additional mitigations.

**Alternative IV** – All of the modifications and mitigations in Alternative III plus relocation of mine adits and mill site.

**Alternative V** – Most of the modifications and mitigations from Alternative III together with those from Alternative IV relating to the relocation of the mill site, and several additional modifications and mitigations, including: use of a tailings paste disposal system; enclosure of the rail loadout facility; and relocation of the evaluation adit support facilities away from Rock Creek.  Alternative V was analyzed as the preferred alternative.

05-107 AR 88-2 at 2-13 to 2-15.  The Forest Service issued a Record of Decision

in December 2001 selecting Alternative V with modifications.  05-107 AR 91A-1 at 3.

The 2001 Final Environmental Impact Statement lists the federal, state, and local "Permits, Licenses and Approvals" upon which any mining plan adopted by the Forest Service must be premised.  05-107 AR 88-2 at 1-5 to 1-7.  Among the required documents is a biological opinion from the United States Fish and Wildlife Service.  Id. at 1-5.  The Final Environmental Impact Statement incorporated the then-existing 2000 Biological Opinion issued by the Fish and Wildlife Service.  05-107 AR 88-2 at 1-9; 05-107 AR 89-1 Appendix E.  The Fish and Wildlife Service withdrew the 2000 Biological Opinion in March of 2002, to settle a legal challenge to the adequacy of the document.  AR 05-107 91A-2 at 3.  The Forest Service responded by withdrawing its 2001 Record of Decision.  05-107 AR 114-18.  A new Biological Opinion was issued in 2003.  05-107 AR 120-1.  The Forest Service then issued its still-operative 2003 Record of Decision approving Revett's proposed Plan of Operations through the adoption of Alternative V with modifications.  05-107 AR 91A-2 at 3.

The Rock Creek Alliance led a coalition of Plaintiffs in challenging the 2003 Biological Opinion in this Court.  The disposition of that claim remanded the 2003 Biological Opinion to the Fish and Wildlife Service, finding that the agency's no-jeopardy conclusion with regard to grizzly bears was arbitrary and

capricious due to the agency's inadequate consideration of the effects of the mine on the imperiled female grizzly bear population.  Rock Creek Alliance v. U.S. Fish and Wildlife Service, 390 F. Supp. 2d 993, 1009 (D.Mont. 2005).  The Court also concluded that the agency failed to meet its procedural obligation to consider the cumulative effects of the action on the listed bull trout distinct population segment.  Id. at 1010.

The Fish and Wildlife Service replaced the remanded 2003 Biological Opinion with its 2006 Biological Opinion.  05-107 AR 126-1.  After the Forest Service requested re-initiation of consultation, and in response to new information, the Fish and Wildlife Service issued a Supplement to the 2006 Biological Opinion in 2007 (the "2007 Supplement"), in which it concluded that the re-initiation of formal ESA consultation was not required.[5]  05-107 AR 126-2 at 3.  The 2006 Biological Opinion and the 2007 Supplement reach a "no jeopardy/no adverse modification" conclusion as to bull trout and a "no jeopardy" conclusion as to grizzly bears, and are the targets of the Plaintiffs' ESA claims in these cases.  On December 10, 2007, Forest Supervisor Paul Bradford sent a Determination Letter to Revett stating that the Forest Service had reviewed the 2006 Biological Opinion and 2007 Supplement and concluded that the documents did not present

---

[5]The Forest Service sought to re-initiate consultation because of the change in the environmental baseline resulting from this Court's December 13, 2006 decision setting aside the 2004 Kootenai National Forest Plan amendment on access.  See Cabinet Resource Group v. United States Fish and Wildlife Service, 465 F. Supp. 2d 1067 (D. Mont 2006).

substantial changes or contain significant new information, and so the Forest

Service would not prepare a supplemental environmental impact statement and

would not issue a new record of decision.  05-107 AR 127-7 at 1-2.  Supplemental

information reports attached to the Determination Letter document the agency's

review of potentially new and significant information.  Id.; 05-107 AR 131-2.

## C.    Plaintiffs' Claims

### 1.    The Lead Case (CV 05-107-M-DWM)

Count I of the Amended Complaint in the lead case alleges that the Forest

Service violated Section 7 of the ESA by authorizing irreversible and irretrievable

commitments of resources prior to the completion of the Forest Service's required

consultation with the Fish and Wildlife Service.  Plaintiffs contend that ESA

consultation is not complete, despite the issuance of the 2006 Biological Opinion

and 2007 Supplement, because the conclusions of the Fish and Wildlife Service

are contingent upon the agency's subsequent approval of monitoring and

mitigation actions to be taken with regard to grizzly bears and bull trout.

Count II alleges that the Plan of Operations authorized by the Forest Service

will result in an illegal take of listed species in violation of ESA Section 9,

because the Forest Service has relied on an invalid biological opinion.  Count II is

contingent on a finding in the Plaintiffs' favor on at least one of the ESA Section 7

claims put forth in the companion case.

Count III of the Amended Complaint claims the Forest Service committed multiple NEPA violations.  Plaintiffs say the Final Environmental Impact Statement lacked critical information resulting in an unreliable environmental baseline.  They also argue that the agency should have considered an alternative that would have approved only the evaluation adit and not the entire project. Count III further contends that the Forest Service unlawfully deferred its mitigation analysis and its environmental baseline and environmental impacts analysis, and that the Final Environmental Impact Statement failed to review the impacts of discharging mine water to ground water.

Count IV alleges violations of the Clean Water Act and the Organic Act. Plaintiffs say the mine will cause sedimentation in violation of the water quality standards established by the State of Montana pursuant to the Clean Water Act.

Count VI contains a NFMA claim alleging that the Forest Service's action violates the applicable Kootenai National Forest Plan.  The Forest Plan incorporates the Inland Native Fish Strategy, which in turn sets forth management standards and guidelines for minimizing adverse effects on inland native fish species from planning actions.  Plaintiffs argue the Forest Service failed to comply with the Fish Strategy's management standards.

## 2.    The Companion Case (CV 08-28-M-DWM)

Count I of the companion case alleges an ESA Section 7 claim challenging

the Fish and Wildlife Service's "no jeopardy" determination for grizzly bears in the 2006 Biological Opinion.  Plaintiffs say the agency violated the law by arbitrarily calculating the necessary acreage of mitigation habitat and by basing its decision in part upon the future acquisition of mitigation habitat that Plaintiffs say is not likely to occur.

Count II of the companion case alleges ESA Section 7 violations as to the Fish and Wildlife Service's conclusions on bull trout.  In the critical habitat context, Plaintiffs say the agency failed to assess the impacts of the project on critical habitat's value for recovery and improperly relied upon a large-scale analysis in reaching its "no adverse modification" conclusion.  As to the jeopardy analysis, Plaintiffs contend the agency failed to consider the current status of the bull trout across its range and failed to properly assess the impact of the extirpation of Rock Creek population.

## III.  Analysis

**A.    Legal Standards Applicable to All Claims**

**1.    Standard of APA Review**

Agency decisions can only be set aside under the APA if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971) (quoting 5 U.S.C. §706(2)(A), overruled on other grounds by Califano v. Sanders, 430 U.S.

99 (1977)).  Agency action can be set aside  "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983); Alvarado Community Hospital v. Shalala, 155 F.3d 1115, 1122 (9th Cir. 1998). The court must ask "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment ... [The court] also must determine whether the [agency] articulated a rational connection between the facts found and the choice made.  [The] review must not rubber-stamp ... administrative decisions that [the court deems] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute."  Ocean Advocates v. U.S. Army Corps of Engineers, 361 F.3d 1108, 1119 (9th Cir. 2004) (internal citations and quotations omitted).

### 2.    Summary Judgment Standard

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); see also, Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Summary judgment is particularly applicable to cases involving judicial review of

final agency action.  <u>Occidental Engineering Co. v. INS</u>, 753 F.2d 766, 770 (9th

Cir. 1985) (citation omitted).  Summary judgment is appropriate in this case

because the issues presented address the legality of the Federal Defendants'

actions based on the administrative record and do not require resolution of factual

disputes.

**B.    Clean Water Act and Organic Act (Count IV, lead case)**

   **1.    Legal Standard**

      **a.    Clean Water Act**

The Clean Water Act, 33 U.S.C. § 1251 *et seq*., was enacted "to restore and

maintain the chemical, physical, and biological integrity of the Nation's waters."

33 U.S.C. § 1251(a).  The Clean Water Act fosters the creation of water quality

standards, which are then to be developed by the states.  33 U.S.C. § 1313(c).  The

standards created by the states are subject to EPA review and approval.  33 U.S.C.

§ 1313(a) and (c).  The statute requires that the water quality standards developed

by the states set forth the designated uses of the waters involved and water quality

criteria for the waters involved based on the designated uses.  33 U.S.C. §

1313(c)(2)(A).  Federal agencies are required to comply with state water quality

standards "to the same extent as any nongovernmental entity."  33 U.S.C. §

1323(a).

Plaintiffs identify two water quality regulations enacted by the State of

Montana that they contend will be violated by the mine project.  The Montana standards prohibit increases over naturally occurring turbidity of greater than five nephelometric turbidity units except as permitted in Mont. Code Ann. § 75-5-318.[6] Mont. Admin. R. 17.30.623(2)(d).  The same rule bans increases over naturally occurring concentrations of "sediment or suspended sediment (except as permitted in [§ 75-5-318]), settleable solids, oils, or floating solids, which will or are likely to create a nuisance or render the waters harmful, detrimental, or injurious to ... wild animals, birds, fish, or other wildlife."  Mont. Admin. R. 17.30.623(2)(f).

A citizen may bring a private action against an alleged polluter under the Clean Water Act, but not without first giving notice to the defendant.  33 U.S.C. § 1365(a) and (b).  The statute prohibits the filing of a private citizen suit "prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order[.]"  33 U.S.C. § 1365(b)(1)(A).  Federal regulations require that the congressionally-mandated notice identify the standard, limitation, or order violated, describe the activity constituting and alleged violation, give the location and date or dates of the alleged violation, and name the party responsible for the alleged violation.  40

---

[6]Mont. Code Ann § 75-5-318 allows the Montana Department of Environmental Quality or Department of Fish, Wildlife, and Parks to authorize short-term water quality standards for approved activities on a case-by-case basis.

C.F.R. 135.3(a).  The notice must also contain the full name, address, and telephone number of the person giving notice.  Id.  The notice requirement is to be strictly construed, and a failure to give proper notice robs a district court of subject matter jurisdiction over a subsequent suit in federal court.  Washington Trout v. McCain Foods, Inc., 45 F.3d 1351, 1354-55 (9th Cir. 1995).

### b.    Organic Act

The Forest Service Organic Administration Act of 1897, 16 U.S.C. § 551, requires the Forest Service to regulate the "occupancy and use" of the national forests and to "preserve the forests thereon from destruction."  Federal regulations require that mining activity "shall be conducted so as, where feasible, to minimize adverse environmental impacts on National Forest surface resources[.]"  36 C.F.R. § 228.8.  The mining operator's plan of operations must describe how the operator intends to meet the regulatory requirements for environmental protection put forth in 36 C.F.R. § 228.8, and the operator must comply with all state and federal water quality standards, including those promulgated under the Clean Water Act.  36 C.F.R. §§ 228.4(c)(3), 228.8(b).  The operator also has a separate regulatory obligation to "take all practicable measures to maintain and protect fisheries and wildlife habitat which may be affected by the operations."  36 C.F.R. § 228.8(e).

### 2.    The Plaintiffs' Arguments

The Plaintiffs argue that the Forest Service has not complied with water

quality standards and has failed to protect fisheries as required by the Clean Water

Act.  The claims relate to what the Plaintiffs allege will be significant increases in

sedimentation in Rock Creek as a result of the mine project, and in particular the

Forest Service's estimate that the mine project would result in 400 tons of

sediment per year entering Rock Creek.  Because Plaintiffs offer no citations or

argument related to Montana's numeric turbidity regulatory standard, it is assumed

their Clean Water Act claim alleges violation of the narrative standard at Mont.

Admin. R. 17.30.623(2)(f), prohibiting increases in sedimentation "which will or

are likely to create a nuisance or render the waters harmful, detrimental, or

injurious to ... fish[.]"  Mont. Admin. R. 17.30.623(2)(f).  The Plaintiffs' argument

under the Organic Act appears to be derivative of their Clean Water Act claim.

See Plaintiff's Opening Brief (Doc. No. 90) at 7 ("The [Forest Service] violates

the Organic Act and Part 228 regulations when it fails to ensure that water quality

standards and fisheries will be protected at all times.").

### 3.    Subject Matter Jurisdiction

Revett argues that the Plaintiffs' Clean Water Act claim fails for lack of

subject matter jurisdiction because the Plaintiffs did not comply with the notice

provision of 33 U.S.C. § 1365(a) and (b), as implemented by 40 C.F.R. 135.3(a).

Plaintiffs yield to Revett's claim that they failed to provide notice, but argue that

notice is unnecessary because they are not proceeding under the Clean Water

Act's citizen suit provision at § 1365, but instead are suing the Forest Service

pursuant to the APA and 33 U.S.C. § 1323(a), which makes federal agencies

subject to water quality standards "to the same extent as any nongovernmental

entity."

Whether there is subject matter jurisdiction over the Clean Water Act claim

depends on whether the Rock Creek Mine Project is a point source discharge or a

nonpoint source discharge for purposes of the federal regulations.[7]  The citizen

suit provision at 33 U.S.C. § 1365 does not authorize an action alleging nonpoint

source pollution in violation of the Clean Water Act; such claims must instead be

brought under the APA and 33 U.S.C. § 1323(a), which has no notice requirement.

Oregon Natural Resources Council v.United States Forest Service, 834 F.2d 842,

849-51 (9th Cir. 1987).   Where a plaintiff seeks to enforce the Clean Water Act

against a point source of pollution, the claim properly arises under the citizen suit

provision, and is therefore subject to the notice requirement.  Id. at 851.  The

Ninth Circuit in Oregon Natural Resources Council explicitly stated that judicial

review under the APA is only available in cases involving nonpoint sources of

---

[7]A "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."  33 U.S.C. § 1362(a).  "Nonpoint source" pollution "does not result from the 'discharge' or 'addition' of pollutants from a point source.  Examples of nonpoint source pollution include runoff from irrigated agriculture and silvicultural activities."  Oregon Natural Resources Council v. United States Forest Service, 834 F.2d 842, 849 n.9 (9th Cir. 1987).

pollution:

> This decision should not be interpreted to suggest that plaintiffs
> seeking relief under the [Clean Water Act] may circumvent the notice
> requirement of the citizen suit provision by resorting to the APA....
> Where plaintiffs may otherwise proceed under the citizen suit
> provision, they should not be allowed to bypass the explicit
> requirements of the Act established by Congress through resort to ...
> the APA[.]"

Id. at 851.

The Plaintiffs concede the Rock Creek Mine project is a point source, a

concession noted in an earlier Order.  See Doc. No. 190 at 6.  Consequently, the

Plaintiffs' claim arises under the citizen suit provision of § 1365, and the notice

requirement applies.  The failure to provide the required notice deprives this Court

of subject matter jurisdiction over the Clean Water Act claim.  That claim is

dismissed under Fed. R. Civ. P. 12(h)(3).  Washington Trout, 45 F.3d at 1354-55.

The Plaintiffs' arguments relating to the violation of state water quality standards

under the Clean Water Act will not be considered in deciding Count IV of the

Amended Complaint in the lead case.

The Plaintiffs are then left with a claim under the Organic Act, which

authorizes the Forest Service to regulate occupancy and use so as to preserve the

national forests "from destruction."  16 U.S.C. § 551.  Plaintiffs count on the

regulations set forth at 36 C.F.R. §§ 228.1-228.8, although those regulations do

not relate directly to the agency but instead prescribe the obligations and standards

to which the mine operator is subject.  The Plaintiffs reason that 36 C.F.R. §

228.8(e), in conjunction with the Organic Act, requires the Forest Service to

minimize adverse environmental impacts where feasible and to reject any mining

plan for which the operator has failed to take all practicable measures to maintain

and protect fisheries and wildlife habitat.  At least one case holds that Forest

Service action may be set aside under the Organic Act for failure to adhere to 36

C.F.R. § 228.8, Hells Canyon Preservation Council v. Haines, 2006 WL 2252554

at *6 (D. Or. 2006), and neither Revett or the Forest Service disputes the viability

of the Plaintiffs' Organic Act claim standing alone.  The arguments with regard to

sedimentation are analyzed to determine whether the Forest Service arbitrarily and

capriciously failed to minimize adverse environmental impacts where feasible and

failed to require Revett to take all practicable measures to maintain and protect

fisheries and wildlife habitat.

> **4.     Discussion**

>> **a.     Effects of the Mine Project on Fisheries**

The Plaintiffs' Organic Act claim is based on the added sediment in Rock

Creek that the mine will cause, which Plaintiffs say will impermissibly degrade

aquatic habitat.  Summarizing the current (pre-project) conditions, the 2007

Supplement states with respect to bull trout, "In general, habitat conditions in the

Rock Creek watershed are degraded with relatively high levels of sediments

present in spawning gravels and periods of stream flow intermittence occurring in many years." 05-107 AR 126-2 at B-60. Fine sediment levels in the watershed are currently "at-risk," meaning the present conditions will allow the bull trout population to persist, "but the population may not improve unless the levels of fine sediment decrease to a point where survival of bull trout eggs would increase." Id. at B-74. The Fish and Wildlife Service identifies increases in fine sediment during the mine's five-year construction phase as "[t]he most obvious direct impact" to bull trout." Id. at B-73. The 2007 Supplement states,

> The highest levels of sediment loading are expected to occur during the 5-year construction period with significantly decreasing levels of additional sediment entering the stream over the 35-year operating life of the mine. The increase in sediment loading is estimated to be 46 % in the West Fork of Rock Creek, 20 % in the East Fork of Rock Creek, and 38 % overall for the entire Rock Creek watershed. These values are probably over estimates and likely present a worse-case [sic] scenario because of the parameters used in the modeling evaluation and because the evaluation did not include the proposed sediment abatement mitigation activities, which would occur before, during, and after construction.

Id. at B-73. The increase of 46 percent in the West Fork of Rock Creek is "a result of evaluation adit and access road construction," and therefore will occur mostly, if not entirely, during Phase I. 05-107 AR 89-1 at N-10.

The estimated increase in sedimentation is based on the Forest Service's "R-1 WATSED" ecological model. The Forest Service ran the model for the years 1999-2031 to derive an annual mine sedimentation estimate. 05-107 AR 71-2 at

7-8.  By subtracting the sediment amount in existing 1998 conditions from the

projected sediment amount during construction, the WATSED model predicted an

annual increase in sedimentation of 66.1 tons per year at the height of mine

construction.  05-107 AR 89-1 at N-9.  Because the Forest Service concluded that

the WATSED analysis accurately models real-world processes but consistently

under-predicts actual numbers, the agency applied a multiplier of 3 to account for

under-estimation of real world effects, resulting a prediction of 198.3 tons per

year.  Id.  The Service then doubled the estimate to "compensate for the marginal

accuracy of the model, the limited amount of validation data, and less than 100

percent effective mitigation."  Id.  The resulting estimate of 396.6 tons per year

was rounded up to 400 tons per year "[t]o dilute the aura of precision that 396.6

tons/year implies."[8]  Id.

     Based on those calculations, the Record of Decision requires Revett to

---

[8]Plaintiffs claim in their Reply Brief that the WATSED model's 400-ton annual estimate is too low, citing a handwritten note from Forest Service hydrologist Steve Wegner in which Wegner sets forth his calculations using the WATSED model.  05-107 AR 72-1.  Wegner states that "the difference between existing conditions and the implementation of [Alternative V]" is 78.5 tons of annual sediment, which when multiplied by six resulted in an estimate of 500 tons per year.  Id.  The final WATSED model is based on a lower figure of 66.1 tons of annual sediment, yielding an estimate of 400 tons per year after applying the multiplier and rounding up. 05-107 AR 89-1 at N-9.  Wegner's notes are dated April 21, 1998, while the final WATSED numbers are taken from a document dated May 6, 1998.  The reason for the discrepancy is not clear from the record, and because the Plaintiffs raise the issue for the first time in their Reply Brief, the Forest Service did not have an opportunity to respond.  Without more, this unexplained difference in calculations is not a basis to find that the Forest Service violated the Organic Act by failing to minimize adverse consequences and to require Revett to take measures to protect fisheries.

reduce sediment from existing source areas by 400 tons per year to offset the

increased sedimentation from mine construction.  Id.; 05-107 AR 91A-2 at 20.

The 400-ton sediment source reduction requirement is in addition to the other

mitigation measures contained in the chosen alternative.[9]  05-107 AR 89-1 at N-9.

The Forest Service concludes that the combination of the sediment source

reduction requirement and the other required mitigation measures will not result in

a net increase in sediment in the Rock Creek drainage and may slightly improve

sediment conditions over the long term.  05-107 AR 88-2 at 4-133; 05-107 AR 89-

1 at N-10; 05-107 AR 91A-2 at 20; 05-107 AR 72-32 at 8.  The Fish and Wildlife

Service stated in the 2007 Supplement,

> It is likely habitat impacts caused by an increase in sediment loading
> in the Rock Creek watershed would occur sometime during the first
> five years when site disturbance is greatest due to construction of
> roads and facility development.  After this 5-year period, sediment
> levels would probably stabilize, most likely within two years, and
> gradually return to near pre-project conditions over some unknown
> period of time.

01-107 AR 126-2 at B-76.

**b.    Analysis**

To support their Organic Act claim, the Plaintiffs insist that the Forest

---

[9]Other mitigation measures include "road construction [best management practices], road paving, reconstruction and resurfacing, riparian vegetation buffers along roads and around the mill site, slash filter windows on cut-banks and around culvert openings, downslope sediment traps, immediate hydro-seeding after soil disturbance, and other measures as appropriate."  05-107 AR 126-2 at B-75.

Service failed to take feasible steps to minimize environmental impacts and failed to require Revett to take practicable measures to protect fisheries because (1) the Record of Decision does not require adequate mitigation during the Phase I evaluation adit period; and (2) based on the conclusions in the 2007 Supplement, mitigation efforts will not adequately protect bull trout habitat from sediment increases during the mine's five- to seven-year construction and facility development period.

### i.    Mitigation During Phase I

Plaintiffs reason that under the 2007 Supplement, the 400-ton sediment source reduction requirement does not take effect until after the Phase I evaluation adit period, arguing that the lack of a 400-ton annual offset in sediment during the adit phase violates the Organic Act.  05-107 AR 126-2 at B-98.

The Forest Service maintains that the sediment source reduction requirement takes effect after the adit phase,[10] but notes that other sediment mitigation measures are required during all stages of the mine project, including Phase I.  The 2003 Record of Decision contains a table of stipulations setting forth

---

[10]Revett argues that the sediment source reduction requirement applies to Phase I through Stipulation 39 in Attachment 1 to the 2003 Record of Decision.  The assertion is not supported by the language of Stipulation 39, which requires that the sediment source reduction requirement be implemented "as outlined" in the 2003 Biological Opinion.  05-107 AR 91A-2 Attachment 1 at 17.  The 2003 Biological Opinion, like its successor now in effect, requires the sediment source reduction only with respect to Phase II, not Phase I.  05-107 AR 91A-2 at 38-42; 05-107 AR 126-2 at B-98.

mandatory mitigation requirements.  05-107 AR 91A-2 at 4; Attachment 1.

Attachment 1 contains the following relevant agency stipulations:

- Road re-routing and bridge construction (5, 5(a), 5(b))

- Best management practices to minimize potential impacts to bull trout (41)

- Sediment catchment basins, vegetation buffers, bridges, agency pre-approval of road and facility construction sites (53(b)-(e))

- Procurement of a storm water permit and 318 permit from DEQ (54)

- Water quality monitoring and a remedial action plan, including monitoring during Phase I (73, 73(a), 73(b))

- Transportation monitoring (78)

05-107 AR 91A-2, Attachment 1.  Additionally, Stipulation 64 mandates that all

final design plans, revegetation and reclamation plans, and plans required for state

water quality permitting be submitted and approved by the relevant agencies prior

to construction of the evaluation adit.[11]  Id.  These requirements will no doubt

---

[11]Following consultation with the Forest Service, Revett prepared a Sediment Mitigation Plan for the evaluation adit.  05-107 AR 130-48; 05-107 AR 139-1, 139-2, 139-3, 139-3a, 139-4, 139-13, 139-14, 139-15, 139-16.  Because the agency's analysis using the WATSED model did not differentiate the adit phase from the mine phase with regard to sediment loading, the adit Sediment Mitigation Plan uses a multiplier based on the ratio of disturbed area to conclude that the adit phase will require a reduction of 15.4 tons per year.  05-107 AR 130:48 at 1.  The Plan provides for an even greater level of reduction of 54.9 tons per year, and notes that most of the additional reduction over 15.4 tons is occasioned by Revett's planned compliance with the Forest Service's road construction requirements.  Id.  It is not clear whether the adit Sediment Mitigation Plan has been approved by the Forest Service, nor is it relevant to consideration of this question.  The issue is whether the Forest Service complied with the Organic Act in approving the mine project; Plaintiffs' claim turns on what the Forest Service's decision requires, not what Revett has done subsequent to the issuance of the Record of Decision.

yield some benefits, but none of them appears to be likely to off-set or otherwise significantly affect the amount of sediment introduced to the watershed during Phase I.

The Forest Service points out that it has also established a monitoring plan that includes monitoring during the evaluation adit at Appendix K of the Final Environmental Impact Statement, as amended by the 2004 Record of Decision. 05-107 AR 91A-2, Attachment 2.  The Plaintiffs contend that Appendix K's monitoring plan "is just a plan to monitor the Phase II discharges."  Doc. No. 124 at 5.  Because Plaintiffs raise this argument for the first time in their Reply Brief, the Defendants had no opportunity to respond.[12]  A review of Appendix K shows that monitoring will occur during Phase I as well.  Appendix K states, "The water resources monitoring program would begin during the first quarter of construction of the evaluation adit, and would be maintained during the life of the project as well as after reclamation for a period of time to be specified by the Agencies."  05-107 AR 91A-2, Attachment 2 at 7.  The 2003 Record of Decision specifically requires Revett to "[m]odify and/or update the monitoring portion of the Plan of Operations for the evaluation adit as outlined in the revised Appendix K in Attachment 2 of the [Record of Decision.]"  05-107 AR 91A-2 at 65.

---

[12]There are several instances throughout the briefing in which Plaintiffs first raise arguments in support of their claims in their reply briefs.  See supra note 8; infra pp. 30-31, note 16.  The practice does little to assist the Court's consideration of the issues.

The Forest Service also relies on the Record of Decision's requirement that Revett obtain a discharge permit under the Montana Pollutant Discharge Elimination System (the "MPDES Permit").  05-107 AR 91A-2 at 1, 63-64.  The permit is the means by which the Montana DEQ enforces state water quality standards, and the Forest Service is allowed to rely on the Montana DEQ to issue and enforce a valid permit.[13]  Great Basin Mine Watch v. Hankins, 456 F.3d 955, 965-66 (9th Cir. 2006).  Plaintiffs do not quibble with the propriety of the agency's reliance on the MPDES Permit, but complain that the permit does not apply to the Phase I adit.  The permit lists five covered discharge points, which the Plaintiffs say are "from Phase II facilities only."  Doc. No. 124 at 3; 05-107 AR 89-1, Appendix D at 7.  It is not clear from the record that all of the five discharge points relate exclusively to Phase II activity, and the Plaintiffs offer nothing more than a conclusory statement in support of their argument.

Because Plaintiffs first raise the issue in their Reply Brief, the Defendants

---

[13]Plaintiffs have attempted to make an issue of the status of the MPDES permit via notice of supplemental authority.  On February 12, 2009, Plaintiffs notified the Court of the Montana Supreme Court's decision in Clark Fork Coalition v. Montana Department of Environmental Quality, 197 P.3d 482 (Mont. 2008), voiding the permit as to certain outfalls and requiring remand to the Montana DEQ.  Doc. No. 166.  This Court granted Revett's motion to strike the notice of supplemental authority.  Doc. No. 190.  The status of the permit is irrelevant to the consideration of this matter.  The Forest Service's approval of the mine project is conditioned on the permits being obtained and complied with prior to work on the adit.  05-107 AR 91A-2 at 1, 63-64; Attachment 1 at 27.  The process by which Revett obtains the necessary permits has no relation to the question of whether the Forest Service has done enough to comply with the Organic Act, and poses no issue at this time because construction of the Phase I adit has yet to begin.

did not have an opportunity to respond.  The clear implication is that the Forest

Service maintains that the MPDES Permit covers only Phase I of the Mine

project.[14]  Regardless, the argument is ultimately a red herring.  Plaintiffs cannot

meet their burden on their Organic Act claim by insisting that the MPDES Permit

does not apply to the adit, and they do not make a serious argument that the

Record of Decision authorizes the evaluation adit to go forward without

complying with state water quality standards.  The 2003 Record of Decision

requires Revett to obtain all necessary permits for all phases of the mine project,

including permits related to water quality: "The discharge limitations and

monitoring requirements are necessary to ensure that all project-related discharges

comply with the Montana Water Quality Act."  05-107 AR 91A-2 at 63.

    The Forest Service has shown that its Record of Decision requires

monitoring and permitting in relation to Revett's construction of the Phase I

evaluation adit, along with multiple mitigation measures.  What the Forest

Service's decision does not do is impose upon Revett any sediment reduction

---

[14]The Forest Service's position is stated explicitly in the agency's most recent monthly status report, in which it states with respect to the MPDES Permit,

> [E]xisting permit limited to exploratory evaluation adit (Phase I of project), not mining:  Clark Fork Coalition v. Montana Dep't of Envtl. Quality, 197 P.23 482 (Mont. 2008) voided the Montana permit outfalls 001 and 002 applicable to actual mining.  Thus, the state court action does not affect the MPDES permit for Phase I, the Evaluation Adit.

Doc. No. 200-1 at 1.

requirement for Phase I.  The Forest Service failed, both in its briefing and at the

hearing on March 17, 2010, to provide any reasonable explanation for its decision

to excuse Revett from the sediment source reduction requirement during Phase I of

the Project.  The failure to include such a requirement is not a violation of the

Organic Act *per se*; the statute does not dictate that quantified sediment reduction

measures be in place in every instance.  In this situation, however, the absence of

such a requirement is a fatal defect.

The Forest Service's view that the project will result in no net increase in

sedimentation within the Rock Creek watershed is contingent on the operation of

the sediment source reduction requirement to offset the introduction of new

sediment.  It is incongruous for the Forest Service to conclude that protection of

aquatic habitat in Rock Creek requires that 400 tons of sediment must be removed

each year during the construction phase, but that no sediment reduction measures

are needed during Phase I, which by the agency's own estimate will bring about a

46 percent increase in sedimentation in the West Fork of Rock Creek.  05-107 AR

89-1 at N-10.  It is all the more important to initiate sediment reduction measures

as soon as possible in light of Forest Service modeling indicating "a time lag of

four years between a change in sediment input and a change in streambed fine

sediment."  Id.

Revett's obligation to remove 400 tons of sediment annually will extend

from the construction of the mine through the close of operations, a term that is intended to span 30 years or more.  The Phase I evaluation adit is expected to take 18 to 24 months.  A Phase I sediment reduction requirement would force Revett to begin its mitigation activity two years early, but neither the Forest Service nor Revett has explained why such a requirement is unreasonable or impracticable. The benefits of sediment reduction during Phase I are evident from the record, and given what lies ahead for Revett during Phase II, the costs are relatively minor. The record is bereft of analysis or explanation concerning this problematic but capacious gap.  In the absence of any reasonable explanation for the Forest Service's decision to allow Phase I to go forward without sediment reduction measures in place, the decision is arbitrary.   Under the Organic Act the Forest Service must minimize adverse environmental impacts where feasible and must require Revett to take all practicable measures to maintain and protect fisheries and wildlife habitat.  The feasibility and practicality of mitigation measures are evident in the proposals for Phase II.  The seeming explanation is not technical but more a consideration of risk for ultimate approval of Phase II and how costs should be spread in Phase I.  Nonetheless, if this is the case, it does not comport with congressional intent.  The extension of the sediment source reduction requirement into Phase I is a feasible, practicable measure that will help to minimize the adverse environmental impacts from Phase I of the mine project.

The Plaintiffs' are entitled to summary judgment in their favor on this aspect of their Organic Act claim.

### ii.    Sedimentation During the Construction Period

The Plaintiffs maintain that the Forest Service has violated the Organic Act by allowing excessive sediment loading during the first five to seven years of the mine project.  The claim is based on this statement by the Fish and Wildlife Service in the 2007 Supplement:

> It is likely habitat impacts caused by an increase in sediment loading in the Rock Creek watershed would occur sometime during the first five years when site disturbance is greatest due to construction of roads and facility development.  After this 5-year period, sediment levels would probably stabilize, most likely within two years, and gradually return to near pre-project conditions over some unknown period of time.

01-107 AR 126-2 at B-76.  Plaintiffs also note the 2007 Supplement's statement that habitat conditions in the watershed are "degraded," and functioning "at-risk" with regard to sediment.  Id. at B-60, B-62.  In its "no-jeopardy" determination, the Fish and Wildlife Service stated, "Implementation of the proposed action is likely to reduce the reproduction, numbers, or distribution of bull trout within Rock Creek for five to seven years resulting in the local population of bull trout decreasing compared to existing levels."  Id. at B-87.  Plaintiffs hold that based on these conclusions that the Organic Act requires the Forest Service to reject the mine project because it does not require Revett to take all practicable measures to

protect fisheries.

The Forest Service agrees with the findings of the Fish and Wildlife Service, but argues that the language of the 2007 Supplement does not support the Plaintiffs' Organic Act claim.[15]  The Forest Service notes that the Fish and Wildlife Service ultimately issued a "no jeopardy" opinion, concluding that the mine project is "not likely to jeopardize the continued existence of bull trout at the scale of the Lower Clark Fork Core Area, and by extension not likely to jeopardize at the Clark Fork River Management Unit and the larger scale of the Columbia River Interim Recovery Unit."  01-107 AR 126-2 at B-88.  Other language in the 2007 Supplement suggests that the Fish and Wildlife Service does not anticipate serious harmful effects to bull trout habitat:

> Increases in sedimentation, water quality degradation, and changes in channel habitat and complexity related to mining activities are anticipated to reduce the functional ability of critical habitat to a small degree below baseline conditions temporarily, for about five to seven years associated with the construction period.  The areas of critical habitat mostly affected in Rock Creek would be small localized stream segments in close proximity to the project area.  All the primary constituent elements in Rock Creek are expected to remain functional, albeit at a lower level.

---

[15]The parties' briefing in this area analyzes the issues in the Clean Water Act context, with only secondary reference to the Organic Act.  Because the Court does not have jurisdiction over the Clean Water Act claims, this analysis necessarily deals only with the Organic Act.  The orientation of the arguments toward the Clean Water Act creates some difficulty in constructing an analysis under the Organic Act, such as in this instance.  The Forest Service's briefing on this matter is focused on demonstrating that the 2007 Supplement's conclusions do not indicate a violation of a state water quality standard enforceable under the Clean Water Act, and therefore is not particularly responsive to the Organic Act arguments.

Id. at B-90.  Along with its "no jeopardy" finding, the Fish and Wildlife Service

concluded that the mine project is "not likely to destroy or adversely modify bull

trout critical habitat."  Id.

As it relates to the Organic Act, the parties appear to be content to let the

2007 Supplement speak for itself.[16]  The Plaintiffs emphasize select language in an

effort to show that the Forest Service has approved a project that will have harmful

environmental effects on bull trout, while the Forest Service focuses on the

conclusions of the 2007 Supplement that the mine project will not result in

jeopardy and will not destroy or adversely modify critical habitat.

The Forest Service has the better argument.  The Plaintiffs' reliance on

_____

[16]Plaintiffs also rely on a comment submitted by the Regional Supervisor of the Montana
Department of Fish Wildlife and Parks dated April 9, 1998.  The Regional Supervisor
commented on a statement in the Supplemental Draft Environmental Impact Statement that the
project would result in a 30 percent increase in annual sediment yield in the Rock Creek
watershed.  05-107 AR 44-1 at 318; 05-107 AR 86-2 at 4-74.  The Regional Supervisor
commented that an increase in sediment of "30-65%...may be unacceptable, and result in
permanent loss of the Rock Creek bull trout stock, making it irrelevant to bull trout that sediment
loading will be reduced at the end of the 30-year project."  05-107 AR 44-1 at 322.  The
Plaintiffs first mention the comment in their Reply Brief, so the Forest Service has not responded
to the point.  The comment relates to a portion of the Supplemental Draft Environmental Impact
Statement discussing the effects of the project without taking into account the planned
mitigation, as is made clear in the version of the discussion contained the Final Environmental
Impact Statement, where the Forest Service says, "This model predicted that annual sediment
yield in the entire Rock Creek watershed during the initial stages of the project (without
considering mitigations) would be 38 percent greater than existing conditions."  05-107 AR 88-2
at 4-133.  As is noted above, both the Forest Service and the Fish and Wildlife Service required
extensive mitigation measures, including the 400-ton annual sediment source reduction
requirement.  To the extent the Plaintiffs rely on the comment to suggest that the mine project, as
approved by the Forest Service, will result in the elimination of the Rock Creek bull trout stock,
it is unpersuasive.

cherry picked statements from the Fish and Wildlife Service's ESA analysis is

undermined by the conclusions of the 2007 Supplement with respect to jeopardy

and bull trout habitat.  The Plaintiffs are left in a position that requires them to

argue either that the Organic Act is more protective of listed species than the ESA,

or that the Fish and Wildlife Service's jeopardy and critical habitat conclusions

violate the ESA.  The Plaintiffs don't argue that the Organic Act extends

protections to endangered species beyond that which is required by the ESA.  On

the other hand the question of whether the Fish and Wildlife Service's opinion in

the 2007 Supplement violates the ESA is more properly addressed in the

discussion of the Plaintiffs' ESA claims below.

The Plaintiffs' position is weakened by the qualifying language in the

Organic Act standards.  The implementing regulations do not impose strict duties,

but rather general requirements: the Forest Service must take "feasible" steps to

"minimize" adverse environmental impacts and must insist that a mining operator

take all "practicable" measures to "maintain and protect" fisheries and habitat.  36

C.F.R. § 228.8, 228.8(e).  The Plaintiffs' excerpts from the 2007 Supplement,

when viewed in isolation, allow for the conclusion that the Forest Service has

approved a project that will have some negative effects on bull trout.  When the

record is considered as a whole, however, and taking into account the deferential

standard of review under the APA, the Plaintiffs' choice selections from the ESA

analysis do not show a violation of the Forest Service's duties under the Organic Act in light of the mitigation, monitoring and permitting required during Phase II in the 2003 Record of Decision.  The Federal Defendants and Revett are entitled to summary judgment on the Plaintiffs' Organic Act claim as it relates to sedimentation during the construction period.

**C.     NEPA (Count III, lead case)**

   **1.     Legal Standard**

NEPA is intended to focus the attention of the government and the public on the likely environmental consequences of a proposed agency action.  Marsh v. Oregon Natural Resource Council, 490 U.S. 360, 371 (1989).  The Act "places on the agency the obligation to consider every significant aspect of the environmental impact of the proposed action" and "ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process."  Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 97 (1983) (citations omitted).

The law imposes procedural obligations on government agencies.  "NEPA does not work by mandating that agencies achieve particular substantive environmental results."  Marsh, 490 U.S. at 371.  NEPA dictates the necessary procedure an agency must follow, but does not state any requirements relating to the outcome of the agency's decision making process.  Robertson v. Methow

Valley Citizens Council, 490 U.S. 332, 359 (1989).

NEPA requires a federal agency to prepare an environmental impact statement detailing the environmental impacts of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This obligation includes the duty to consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). "If several actions have a cumulative environmental effect, 'this consequence must be considered in an [environmental impact statement].'" Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1214 (9th Cir. 1998) (quoting Neighbors of Cuddy Mountain v. United States Forest Service, 137 F.3d 1372, 1378 (9th Cir. 1998)).

The environmental impact statement must describe the impacts of the proposed agency action, any adverse impacts of the proposed action that cannot be avoided, and alternatives to the proposed action which were considered by the agency. Robertson, 490 U.S. at 349. The scope and nature of the direct, indirect, and cumulative impacts analysis is a matter committed to the sound discretion of the agency. Kleppe v. Sierra Club, 427 U.S. 390, 413-14 (1976). If the nature and scope of the analysis is challenged, the reviewing court may only examine whether "the agency has taken a 'hard look' at the environmental consequences." Inland Empire Public Lands Council v. U.S. Forest Service, 88 F.3d 754, 763 (9th Cir.

1996) (quoting <u>Kleppe</u>, 427 U.S. at 410 n. 21).  A court may not interject itself

within the area of discretion of the executive as to the choice of the action to be

taken; only if the agency's analysis of the environmental impact is "arbitrary and

capricious" or "contrary to the procedures required by law" can the reviewing

court conclude that the agency did not take the requisite "hard look."  <u>Kleppe</u>, 427

U.S. at 410 n. 21; <u>Inland Empire</u>, 88 F.3d at 763.

### 2.    The Plaintiffs' NEPA Arguments

The Forest Service stated in the 2003 Record of Decision involving this

project that "there is more than enough information in the project record" to justify

approval of the entire Mine Project.  05-107 AR 91A-2 at 8.  Nonetheless, due to

the Forest Service's desire to "minimize and manage the potential risk from this

project as much as possible," Revett may not begin Phase II until the information

obtained from the evaluation adit has been examined and the agency has approved

modifications to Revett's Plan of Operations.  <u>Id.</u>  Many of the NEPA claims in

the lead case are based on the Plaintiffs' objection to the Forest Service's

conditional approval of Phase II before the completion of the Phase I evaluation

adit.

Plaintiffs insist that the Forest Service violated NEPA when it approved

Phase II of the Mine Project when it lacked critical information that can only be

learned during the Phase I adit.  According to the Plaintiffs, NEPA required the

Forest Service to give consideration to an alternative that would have approved just the Phase I adit but not Phase II.  The Plaintiffs claim the Forest Service illegally deferred until after the Phase I adit its NEPA-mandated analysis of mitigation measures, environmental baseline, and the environmental impacts. Plaintiffs also maintain the Forest Service violated NEPA by failing to review impacts from a new water discharge plan.

### 3. Discussion

### a. Consideration of Phase I as a Stand-Alone Alternative

NEPA requires the consideration of a reasonable range of alternatives to an agency's proposed action.  42 U.S.C. § 4332(2)(C)(iii) and (2)(E).  "Consideration of reasonable alternatives is necessary to ensure that the agency has before it and takes into account all possible approaches to, and potential environmental impacts of, a particular project."  Northern Alaska Environmental Center v. Kempthorne, 457 F.3d 969, 978 (9th Cir. 2006).  The agency must consider an appropriate range of alternatives, but need not discuss every available alternative, and has no obligation to consider alternatives similar to others already considered or alternatives that are infeasible or ineffective.  Id.

The approval of the Phase I evaluation adit as a stand-alone project was not among the alternatives given formal consideration in the Final Environmental Impact Statement.  05-107 AR 91A-2 at 47-60.  In response to a comment

suggesting that the Forest Service should have considered such an alternative, the agency wrote:

> The alternative of only analyzing the evaluation adit was considered. When the agencies received the Evaluation Adit Application, they already had been analyzing the mine application for a number of years.  It was determined by our MEPA/NEPA specialists that we could not just analyze the evaluation adit application since the mine and the evaluation adit were connected actions.  The bottom line is the Agencies had to proceed with a full analysis as is currently being done.  Even if the whole proposal is permitted, [Revett] would still have to do the evaluation adit work first and then show that the findings are consistent with the assumptions used in the EIS analysis.

05-107 AR 91-1, NEPA 801 at 6.

To support its determination that Phase I and Phase II had to be evaluated as connected actions, the Forest Service cites 40 C.F.R. § 1508.25(a)(1), which defines connected actions as actions that "are closely related and therefore should be discussed in the same impact statement."  The regulation states that actions are connected if they "[c]annot or will not proceed unless other actions are taken previously or simultaneously."  40 C.F.R. § 1508.25(a)(1)(ii).

Plaintiffs cite Bob Marshall Alliance v. Hodel, 852 F.2d 1223 (9th Cir. 1988), in support of their argument that the Forest Service should have examined Phase I as a separate alternative.  In the Bob Marshall case, the agencies admitted that they failed to consider a "no action" alternative and argued unsuccessfully that the proposed action did not involve "unresolved conflicts" concerning resource usage and so Section 4332(2)(E) mandating consideration of alternatives

did not apply.  Id. at 1228.  Here the parties agree that the Forest Service is

required to consider all reasonable alternatives, and the dispute is over whether the

Forest Service is correct in its regulatory conclusion that the proper scope of

analysis for all alternatives is to consider the Mine project as a whole.

The decision not to consider Phase I as a separate alternative does not

constitute a failure to take a "hard look" at the alternatives.  The Forest Service

reasonably argues that it was required to analyze Phases I and II together because

of their contingent nature.  Moreover, the practical effect of the Forest Service's

decision in this case means that a "Phase I only" alternative is similar to the

chosen alternative, because in both scenarios the Forest Service's final approval

for Phase II of the project can only occur after Phase I is complete.  Before listing

the required modifications, mitigations and updated plans for Phase II, the 2003

Record of Decision states, "[Revett] cannot implement the second phase of the

project (facility construction, mine development, and mine operation) until the

agencies review and confirm that the following items have been submitted and are

acceptable.  The agencies will then inform [Revett] in writing that operations may

proceed."  05-107 AR 91A-2 at 8.  The selected alternative operates like the

alternative Plaintiffs advocate, as Phase I is currently authorized to proceed, but

Phase II will require subsequent agency approval.

The Plaintiffs object to the Forest Service's decision to approve Phase II

while withholding final authorization to go forward on that phase, but that

objection is best articulated in the Plaintiffs' arguments about deferral of required

NEPA analyses, which are analyzed in the next part of this opinion.  The stated

objection is not a compelling claim for failure to consider alternatives.  The Forest

Service has a plausible justification based on the regulations for its decision to

analyze the mine project as a whole, and, as far as the purposes underlying the

"consideration of alternatives" requirement are concerned, there is little practical

difference between the Plaintiffs' preferred alternative and the one chosen by the

agency.  The Plaintiffs have not shown that the Forest Service's consideration of

alternatives was arbitrary and capricious or contrary to law.  Plaintiffs' NEPA

claim on this point is rejected.

### b.   Deferral of Analysis

The Plaintiffs contend that the Forest Service's decision to approve Phase II

of the Mine project subject to the agency's subsequent review of new plans based

on the information learned during the adit phase results in the impermissible

deferral of NEPA-mandated analyses.

### i.   Mitigation

NEPA's implementing regulations require a discussion in an environmental

impact statement of measures to mitigate environmental consequences "not

already included in the proposed action or alternatives."  40 C.F.R. § 1502.14(f);

40 C.F.R. § 1502.16(h); 40 C.F.R. § 1508.25(b)(3).  Under 40 C.F.R. § 1505.2(c),

"A monitoring and enforcement program shall be adopted and summarized [in the

record of decision] where applicable for any mitigation."  The discussion of

mitigation must contain "sufficient detail to ensure that environmental

consequences have been fairly evaluated."  Robertson v. Methow Valley Citizens

Council, 490 U.S. 332, 350 (1989).  NEPA is procedural so it requires only a

sufficient discussion of mitigation; it does not impose a substantive requirement

that a complete mitigation plan be adopted.  Id. at 352.

　　　The Plaintiffs claim the Forest Service illegally deferred its mitigation

analysis by approving the mine project while allowing Revett to make future

submittal of a watershed assessment including the following components, among

others:[17]

  (1)  An assessment of habitat conditions for bull trout.  The
       assessment would include information on quantity and quality
       of spawning, rearing and over wintering conditions for resident

---

   [17]This analysis addresses those instances of alleged deferred mitigation analysis that the
Plaintiffs identified, developed, and supported with citations to the Administrative Record in
their Opening Brief (Doc. No. 90).  Plaintiffs conclude the relevant section of their Opening Brief
with a citation to Paragraph 48 of their Statement of Undisputed Facts.  Doc. No. 90 at 18.  That
paragraph consists of three single-spaced pages of undifferentiated excerpts from the
Administrative Record identifying critical "mitigation and monitoring plans that were not
submitted prior to completion of the [Final Environmental Impact Statement] and issuance of the
Record of Decision."  Doc. No. 91 at 17-19.  These citations are incorporated in violation of the
briefing rules and are not discussed in further detail here because (1) they are not developed in
the context of a legal argument that the Court can consider and to which the Defendants can
respond, and (2) NEPA does not impose a substantive requirement that the Forest Service adopt
mitigation plans; it imposes a procedural duty upon the agency to discuss mitigation in sufficient
detail.  Robertson, 490 U.S. at 352.

and adfluvial bull trout.

(2)     An assessment of possible sediment mitigation and reduction projects within the Rock Creek basin as outlined in the proposed action.  Recommendations of stream enhancement projects should be included in that assessment.

(3)     A feasibility assessment (including engineering options, conceptual designs, estimated costs and expected sediment load effects) for sediment abatement measures that would reduce sediment levels in the Rock Creek drainage.  This assessment would include any designs for the proposed stream diversion around the proposed paste facility and a complete roads analysis and recommendations associated with proposed mitigation projects and mine activities.

05-107 AR 91A-2 at 38-39.[18]

The implication of the Plaintiffs' argument is that the Forest Service's mandate that Revett submit these assessments in the future is evidence that the agency failed to give adequate consideration to the mitigation elements that the assessments are meant to address.  Plaintiffs say it is insufficient for the Forest Service to "simply [say] that sediment mitigation is needed, while deferring the actual submittal of any plan until years after the NEPA process concluded."  Doc.

---

[18]These assessments are presented as they appear in the 2003 Record of Decision, which incorporated them from the Terms and Conditions portion of the 2003 Biological Opinion.  05-107 AR 91A-2 at 28-42.  Substantially the same assessments are required by the 2007 Supplement now in effect, although the requirements that Revett submit an assessment of habitat conditions and a feasibility assessment contain more detail than they did in the 2003 Biological Opinion.  05-107 AR 126-2 at B-99 to B-100.  Forest Supervisor Bradford's Determination Letter seems to incorporate the updated Terms and Conditions of the biological opinion now in effect, as Bradford writes that despite the Forest Service's decision not to issue a new Record of Decision, "[t]he Plan of Operations will be updated ... to incorporate the few additional mitigation measures required in the 2007 Supplement to the 2006 [Biological Opinion]."  05-107 AR 127–7 at 1.

No. 124 at 8.  The Forest Service contends that the Plaintiffs are mistakenly

equating the agency's acknowledgment of the evaluation adit's "data collection

advantages" with an admission that the Mine project was approved without

sufficient analysis of the necessary mitigation.

The principal case upon which Plaintiffs rely is Neighbors of Cuddy

Mountain v. United States Forest Service, 137 F.3d 1372 (9th Cir. 1998)

("Neighbors"), which presents an extreme case of failure to discuss mitigation.  In

Neighbors, the Forest Service concluded that an approved timber sale would

increase sedimentation in three creeks.  Id. at 1380.  The mitigation discussion

consisted of two paragraphs in which the Service stated it would improve fish

habitat in other drainages, and listed two other potential offsetting mitigation

measures in a single sentence.  Id.  The court of appeals found the analysis of

mitigation measures inadequate, noting that the agency did not discuss measures

intended for the affected creeks, did not specify whether the measures would be

adopted, and did not estimate the effects of the proposed mitigation or state why

such an estimate is not possible.  Id. at 1381.  The panel also noted that the

Service's own experts had disapproved of the mitigation discussion as too

generalized.  Id.  The court of appeals concluded, "The Forest Service's broad

generalizations and vague references to mitigation measures . . . do not constitute

the detail as to mitigation measures that would be undertaken, and their

effectiveness, that the Forest Service is required to provide." Id.

The Forest Service and Revett argue that the mitigation discussion in this case is nothing like the paltry analysis that was rejected in Neighbors, supporting their claim with extensive citations to the Administrative Record.  The description of Alternative V in the Final Environmental Impact Statement lists sediment control measures including mechanical practices to eliminate fugitive dust, grading to reduce erosion, techniques to increase soil stability, hydrologic systems to control sedimentation, and revegetation practices to create a stabilizing cover.  05-107 AR 88-2 at 2-134 to 2-135.  The discussion also requires Revett to submit a storm water management plan for DEQ approval.  Id. at 2-135.   The description contains a discussion of best management practices related to road construction.  Id.  The document then discusses fine sediment mitigation in great detail, including some specifics:

> Sediment mitigation measures would consist of stabilization, armoring and revegetation of existing sediment sources in the Rock Creek floodplain, and maintenance of these measures for the term of the project.  Concurrent with project start-up, [Revett] would mitigate an eroding cutbank where Eagle Creek joins Rock Creek (site P1).  Also beginning in year 1, [Revtt] would inventory the Orr Creek and Snort Creek basins to identify potential sediment mitigation opportunities and estimate the annual fine sediment production in tons/year for all identified floodplain sediment sources in the watershed.  [Revett] would submit a fine sediment mitigation plan to the Agencies for approval, and cumulatively reduce the annual fine sediment loading to Rock Creek by at least 400 tons by mitigating two or more sediment sources in the west fork basin and in the mainstem floodplain of Rock Creek prior to the end of the project

construction period.  Treated mitigation sites would be monitored in average to above average snowpack years (as of April 15), or in the event of greater than bankfull discharge events.  This monitoring would be needed to measure erosion of the treated sites and to quantify any need for further mitigation that would maintain the 400 ton fine sediment reduction and ensure effectiveness of the mitigation program for the life of the project.

Id.

Even more discussion of sediment mitigation is contained in the Final Environmental Impact Statement's section on environmental consequences.  05-107 AR 88-2 at 4-132 to 4-133.  The discussion includes changes to the road construction aimed at minimizing sedimentation, including elimination of a proposed portal access road, relocating and paving an existing road, locating the tailings slurry line next to a road, and shortening the utility corridor.  Id.  The document then goes on to describe the assumptions, application, and results of the WATSED model which was used to arrive at the 400-ton annual sediment reduction requirement.  Id. at 4-133.  The WATSED model is described in detail in Appendix N, and with it a discussion of the agency's estimation of the effects of the sediment source reduction plan.  05-107 AR 89-1 at N-9 to N-10.  Finally, the Environmental Consequences section discusses how the Forest Service's decision to require the use of paste technology as the tailings management option will reduce sedimentation.  05-107 AR 88-2 at 4-110.  The use of the paste facility rather than a tailings impoundment "would allow concurrent reclamation of

tailings paste as construction of the facility progresses, thus reducing the potential for sedimentation in comparison with other proposed alternatives." Id.

The Forest Service notes that it required the Mine project to comply with the water quality standards imposed by the Montana DEQ. 05-107 AR 91A-2 at 19. The Final Environmental Impact Statement incorporates the MPDES Permit and its discussion of water quality standards to which the mine is subject. 05-107 AR 89-1, Appendix D. The agency says it assured itself of the efficacy of Montana DEQ's permitting oversight by analyzing the 20-year water quality compliance history of the Troy Mine, which the Forest Service views as a "geologic analogue" to the Rock Creek deposit and perhaps the "best predictive model available for the proposed project." Id. at 45; 05-107 AR 88-2 at 4-78, 4-79, 4-109. The citations show that there was limited discussion of the Troy mine as a possible predictor of the effects of the Rock Creek mine, however, the detailed 20-year analysis to which the Forest Service refers is dated November 2006, and does not appear to have informed the Forest Service's analysis in the 2001 Final Environmental Impact Statement in any discernable way. 01-107 AR 139-11.

Attachment 1 to the 2003 Record of Decision contains 79 Stipulations consisting of "modifications, mitigation and monitoring requirements," and states the state and federal objectives and authority for each stipulation. 05-107 AR

91A-2 Attachment 1.  There are several stipulations relating to sediment

mitigation, including Stipulations 5, 5(a), 5(b), 39, 41, 53(b)-(e), 54, 64, 73, 73(a),

73(b), and 78.  Id.  The stipulations are derived in part from Appendix K to the

Final Environmental Impact Statement, which contains a conceptual discussion of

the agency's water monitoring plan, but allows for Revett's later submittal of a

finalized plan with quantitative criteria, subject to agency approval.  05-107 89-1

at K-7 to K-13.  Appendix K requires the establishment of monitoring alert levels

and a contingency/corrective action plan, and specifies four monitoring elements

that must be included.  Id. at K-13.  A remedial action plan is also required, and

Appendix K lists four mandatory elements for that plan as well.  Id.

The Administrative Record establishes that the Forest Service's discussion

of mitigation measures in this case was much more thorough than the discussion

found lacking in Neighbors.  Even so, the question remains whether the analysis is

adequate under NEPA.  The answer to the question lies in the resolution of the

competing interpretations of the holding in Okanogan Highlands Alliance v.

Williams, 236 F.3d 468 (9th Cir. 2000).

The Okanogan case involved the approval of a gold mine in a national

forest.  The court of appeals considered the adequacy of the Forest Service's

discussion of mitigation measures, which included a geochemical computer model

to predict water quality and the effects of discharge from a mine-pit lake.  Id. at

473.  The agency discussed other potential mitigation measures and rated their expected effectiveness.  Id. at 474.  The agency proposed monitoring of discharge from the project site, and a remediation requirement if water quality standards were not met.  Id.  The discussion identified remedial steps to be taken in a generalized and non-qualitative manner.  Id.  The agency conducted a similar mitigation discussion for water in the mine-pit lake and waste-rock dumps.  Id. at 475.

The discussion of mitigation measures to be undertaken in Okanogan was largely conceptual and lacking in numerical or quantified standards.  Id. at 473-75.  The mine operator was not required to have concrete mitigation plans in place.  Id. at 474 (requiring operator to "[d]evelop a conceptual engineering design of water treatment system alternatives" in the event discharge water quality problems occur); 475 (conceptual engineering design for treatment system for mine-pit lake water not required until after water quality problems develop, with final agency approval required for any eventual design); 475 ("The Proponent would be required to develop a waste rock management plan as part of Crown Jewel Project permitting.").

The panel in Okanogan began its analysis by observing that NEPA does not require that a mitigation plan be "legally enforceable, funded, or even in final form" to comply with NEPA.  236 F.3d at 473.  The circuit determined that the

agency took the requisite "hard look" at potential problems and "required [the operator] to monitor the *actual* effects of the Project throughout its life."  Id. at 476 (emphasis in original).  The panel approved the agency's procedure for addressing water quality despite the fact that they were presented "in 'bullet' form and [] stated in somewhat general terms," because "[t]he exact environmental problems that will have to be mitigated are not yet known because the Project does not exist."  Id.  The court of appeals acknowledged that the mitigating measures were "described in general terms and [relied] on general processes, not on specific substantive requirements," but found the mitigation analysis adequate because "the actual adverse effects are uncertain, and the EIS considered extensively the *potential* effects and mitigation processes."  Id. at 477 (emphasis in original).

The sediment mitigation and monitoring discussion in this case contains at least as much detail as the discussion in Okanogan.  Plaintiffs maintain that this case is distinguishable from Okanogan because the agency in Okanogan used a computer model and because in Okanogan the actual effects of the project were uncertain, whereas here it is known that the Mine project will cause sediment loading.  Neither argument is persuasive.  Plaintiffs insist that the computer modeling in Okanogan constituted a finalized plan the likes of which is absent here.  In fact, the model in that case was used to provide an estimate of the effects of the project on water quality in the pit and discharge from the lake, just as the

WATSED model was used in this case.  236 F. 3d at 473.  The agency did not put

forth a finalized plan for mitigating those effects in <u>Okanogan</u>.  <u>Id.</u> at 474-75.  Nor

is there more certainty here than in <u>Okanogan</u>.  In <u>Okanogan</u>, as here, the agency

was generally aware of water quality threats from discharge, but was not able to

measure the precise effects until the project began.  <u>Id.</u> at 473-75.  To the extent

the Forest Service had any more certainty in this case through the application of

the WATSED model, it responded with a sediment source reduction plan featuring

a detailed, quantified annual reduction requirement.

     The record shows that the Forest Service took the requisite hard look and

did not impermissibly defer its mitigation analysis.  Plaintiffs' NEPA argument on

this point is rejected.

### ii.      Baseline and Environmental Impact Analysis

     Plaintiffs' assertion that the Forest Service illegally deferred the NEPA-

required baseline and environmental impacts analysis is based on two statements

by the federal agency Defendants.  The Fish and Wildlife Service stated in the

2003 Biological Opinion, "The current level of information present on Rock Creek

bull trout is minimal and additional information on fish presence, absence,

migration and demographic characteristics are necessary to fully assess the

condition of bull trout in this watershed."  05-107 AR 120-9 at B-23.  In its

revised Appendix K on monitoring attached to the 2003 Record of Decision, the

Forest Service stated that "preconstruction" baseline studies would be required because "[t]he aquatics baseline data collected within the Rock Creek Mine project area from 1985-1988 appears to be inadequate," in part because "additional surveys are needed to better understand bull trout populations and the amount and condition of spawning habitat."  05-107 AR 91A-2 Attachment 2 at 19.

Plaintiffs hold these statements to show that the Forest Service issued a Record of Decision approving the mine project despite the lack of adequate baseline information that would only be developed in the future, a violation of 40 C.F.R. § 1502.22(a).  That regulation addresses incomplete or unavailable information in an environmental impact statement and provides, "If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement."

The record references cited by the Plaintiffs show that the agencies believed that the level of information on bull trout was not adequate at the time of the Record of Decision in 2003.  Revett and the Forest Service argue that there is no NEPA violation because the information on bull trout spawning and habitat was updated in the 2007 Supplement, and the update was discussed in a Supplemental Information Report attached to Supervisor Bradford's Determination Letter in

December 2007.  05-107 AR 131-2 at 8-10.[19]  The Forest Service contends the

2007 Supplement is incorporated into the 2003 Record of Decision, consequently

curing any incompleteness in the information considered by the Forest Service.

As the Forest Service puts it, "[O]n December 10, 2007, the Forest Service

updated its NEPA study of the 2000 and 2003 Opinions by considering the more

recent bull trout population and habitat data analyzed in the 2007 Opinion."  Doc.

No. 117 at 12.

The Forest Service may not address a deficiency in an environmental impact

statement through the issuance of a supplemental information report.  Idaho

Sporting Congress v. Alexander, 222 F.3d 562 (9th Cir. 2000).  This Court quoted

Alexander to explain the circumstances in which a supplemental information

report runs afoul of NEPA in Friends of the Clearwater v. McAllister, 214 F.

Supp. 2d 1083 (D. Mont. 2002):

> The Forest Service may use a [supplemental information report] to
> analyze the significance of information that is "truly new," but may
> not use a [supplemental information report] for information that it
> "knew or should have known" at the time it prepared the original
> [NEPA document].  It is "inconsistent with NEPA for an agency to
> use [a supplemental information report], rather than a supplemental
> [environmental assessment] or [environmental impact statement]." to
> add information it knew or should have known.  Environmental

---

[19]Revett also argues that the Forest Service had adequate information on bull trout
populations despite the agencies' dual acknowledgment of the deficiency in bull trout habitat and
spawning information.  The argument is undermined by the fact that both agencies deemed it
necessary to offer a supplementary discussion of these topics after the issuance of the 2003
Record of Decision.

consideration documents must be "prepared early enough so that
[they] can serve practically as an important contribution to the
decisionmaking process and will not be used to rationalize or justify
decisions already made."

214 F. Supp. 2d at 1087-88 (citations omitted).

The statements by the Forest Service and the Fish and Wildlife Service in

2003 show the agencies knew at the time that information on bull trout habitat and

population was inadequate.  The information should have been included in the

Final Environmental Impact Statement.  The agency cannot "update its NEPA

study" with a non-NEPA Supplemental Information Report issued four years after

the Record of Decision.  The Congress enacted a statute that requires such

information be discussed in a NEPA planning document and that the public have

an opportunity to comment on it.  The decision to issue a Record of Decision

despite relying on bull trout information that the agency deemed "inadequate" is

arbitrary and capricious and violates 40 C.F.R. § 1502.22(a).

Summary judgment in the Plaintiffs' favor on this issue is appropriate.  The

2001 Final Environmental Impact Statement and 2003 Record of Decision are set

aside and remanded to the  Forest Service for further action to comply with NEPA,

either through the issuance of supplemental environmental impact statement

addressing the updated bull trout population and habitat information under 40

C.F.R. § 1502.9(c), or the withdrawal of the 2001 Final Environmental Impact

Statement and 2003 Record of Decision and issuance of replacement documents

that comply with NEPA.

### c.    Review of Impacts from New Water Discharge Facility

The Final Environmental Impact Statement analyzed the Mine project

assuming that a pipeline would discharge treated waste water into the Clark Fork

River.  05-107 AR 88-2 at 4-58 to 4-60; 05-107 AR 89-1 Appendix D at 3 of 60.

The analysis states, "The impact of treated discharge on the quality of water in the

Clark Fork River in Montana and Idaho would not be measurable due to the low

concentration of constituents in the treated effluent and the relatively higher flow

available for dilution."  05-107 AR 88-2 at 4-58.  The pipeline requires Revett to

obtain an easement across land owned by Avista Corporation, and Avista has yet

to agree to terms on an easement.  05-107 AR 91A-2 at 18.  Avista sent a letter to

Revett on January 4, 2007, setting forth in detail Avista's concerns and its

conditions for granting the easement as requested by Revett.  05-107 AR 129-6.

Avista's letter makes no representations as to whether the company will ultimately

grant or deny Revett's request for an easement.  Id.

In January of 2006, Revett submitted a revised plan of operations to the

Montana DEQ for the proposed evaluation adit.  The new plan would change the

discharge location for the evaluation adit from the Clark Fork River to ground

water.  The Plaintiffs argue that Revett's revised proposed plan of operations

violates NEPA because the Forest Service did not analyze the discharge of

evaluation adit water to ground water.

The Plaintiffs' claim is premature.  Contrary to the Plaintiffs' view, there is no reason the Forest Service should have anticipated a change in Revett's plan of operations relating to adit water discharge.  The analysis of Revett's discharge plan as presented was appropriate given the contents of the plan at the time. Revett proposed the revision in 2006, five years after the 2001 Final Environmental Impact Statement.  Moreover, the record shows that the Montana DEQ has not acted on the proposal and it has not been submitted to the Forest Service for agency approval.  If Revett adopts and Montana DEQ approves the proposed change, NEPA regulations will then require the Forest Service to consider the change and decide whether it constitutes a "substantial change to the proposed action that [is] relevant to environmental concerns," such that a supplement to the environmental impact statement is warranted under 40 C.F.R. § 1502.9(c)(1)(i).  Plaintiffs' NEPA claim on this point is rejected.

**D.    NFMA (Count VI, lead case)**

**1.    Legal Standard**

Forest planning and management under NFMA occurs at the forest level and at the project level.  16 U.S.C. § 1604; <u>Ohio Forestry Ass'n v. Sierra Club</u>, 523 U.S. 726, 729-30 (1998).  At the forest level, the Service develops and periodically amends a forest plan, which is a broad programmatic planning document for an

entire national forest.  Id.  The development of a forest plan takes place within a

public review process conducted in accordance with NEPA.  16 U.S.C. §

1604(g)(1).  A forest plan establishes the planning goals and objectives for an

individual forest and sets the specific standards and guidelines for the management

of forest resources, ensuring consideration of both economical and environmental

factors.  16 U.S.C. § 1604(g)(1)-(3).

Once a forest plan is implemented, it can be updated through revision or

amendment.  NFMA requires that each forest revise its forest plan periodically.  16

U.S.C. § 1604(f)(5).  This periodic revision gives both the Forest Service and the

public a full opportunity to review the plan's adequacy, through the preparation of

an environmental impact statement, a 90-day public comment period, and other

detailed procedures.  In the interval between required plan revisions, the Service

can issue amendments to the forest plan.

Implementation of a forest plan and any amendments occurs through site-

specific projects.  Idaho Conservation League v. Mumma, 956 F.2d 1508, 1512

(9th Cir. 1992).  Each proposed site-specific project must (1) be consistent with

the forest plan and any amendments; (2) be analyzed as required by NEPA; and (3)

be approved by the responsible Service official.  Idaho Conservation League, 956

F.2d at 1511-12; Inland Empire Public Lands Council v. U.S. Forest Service, 88

F.3d 754, 757 (9th Cir. 1996).

2.    **Background on the Inland Native Fish Strategy**

In 1995 the Forest Service adopted the Inland Native Fish Strategy ("Fish Strategy") to protect native fish species in the western United States, including Montana.  60 Fed. Reg. 43758 (Aug. 23, 1995).  The Fish Strategy provides interim direction in the form of "riparian management objectives, standards and guidelines, and monitoring requirements."  Doc. No. 91-2 at 3.  The Decision Notice for the Fish Strategy describes it as interim management direction pending the completion of environmental impact statements that would result in "long-term management direction."  Doc. No. 91-2 at 3, 5.  The Fish Strategy was intended to remain in effect for "approximately an 18-month time period" pending the establishment of long-term management direction.  Id. at 5.  It appears from the parties' arguments that they agree the "interim" Fish Strategy remained in effect well after its approximate 18-month intended life span, and constitutes a provision of the Forest Plan in effect at the time of the 2003 Record of Decision.

The Fish Strategy "amends the management direction established in ... all existing land and resource management plans for the area covered," including the Kootenai National Forest Plan.  Doc. No. 91-2 at 3.  In describing its interim function the Fish Strategy states:

> The adoption of [the selected alternative] as the Inland Native Fish Strategy could lead to deferring or suspending some resource management projects and activities within priority watersheds within the Riparian Habitat Conservation Areas ... or that degrade [Riparian

Habitat Conservation Areas] during the interim period.  Adoption of
these requirements during the interim period is ***not*** to be considered a
"lockout" of any project or activity from the [Riparian Habitat
Conservation Areas].  However, proper analysis is required prior to
initiation of projects.

05-107 AR 113-2 at A-1 (emphasis in original).

The Fish Strategy establishes Riparian Habitat Conservation Areas

("Conservation Areas") "where riparian-dependent resources receive primary

emphasis."  05-107 AR 113-2 at A-4.  In those Areas, "management activities are

subject to specific standards and guidelines."  Id.  Rock Creek is located within a

Conservation Area.  05-107 AR 88-2 at 4-129.  The Fish Strategy sets forth

standards and guidelines that "apply to all [Conservation Areas] and to projects

and activities in areas outside [Conservation Areas] that are identified through

NEPA analysis as potentially degrading [Conservation Areas]."  05-107 AR 113-2

at A-6.  The standards and guidelines include six provisions relating to minerals

management, and the Plaintiffs identify three that they claim have been violated by

the Forest Service:

> MM-1    Minimize adverse effects to inland native fish species
> from mineral operations.  If a Notice of Intent indicates
> that a mineral operation would be located in a Riparian
> Habitat Conservation Area, consider the effects of the
> activity on inland native fish in the determination of
> significant disturbance pursuant to 36 CFR 228.4.  For
> operations in Riparian Habitat Conservation Area ensure
> operator takes all practicable measures to maintain,
> protect, and rehabilitate fish and wildlife habitat which
> may be affected by the operations.  When bonding is

required, consider (in the estimation of bond amount) the cost of stabilizing, rehabilitating, and reclaiming the area of operations.

MM-2     Locate structures, support facilities, and roads outside Riparian Habitat Conservation Areas.  Where no alternative to siting facilities in Riparian Habitat Conservation Areas exists, locate and construct the facilities in ways that avoid impacts to Riparian Habitat Conservation Areas and streams and adverse effects on inland native fish.  Where no alternative to road construction exists, keep roads to the minimum necessary for the approved mineral activity.  Close, obliterate and revegetate roads no longer required for mineral or land management activities.

MM-3     Prohibit solid and sanitary waste facilities in Riparian Habitat Conservation Areas.  If no alternative exists to locating mine waste (waste rock, spent ore, tailings) facilities in Riparian Habitat Conservation Areas exists, and releases cam be prevented and stability can be ensured, then:

   a.     analyze the waste material using the best conventional sampling methods and analytic techniques to determine its chemical and physical stability characteristics.

   b.     locate and design the waste facilities using the best conventional techniques to ensure mass stability and prevent the release of acid or toxic materials. If the best conventional technology is not sufficient to prevent such releases and ensure stability over the long term, prohibit such facilities in Riparian Habitat Conservation Areas.

05-107 AR 113-2 at A-9 to A-10.

The Plaintiffs also contend the Mine project violates the Fish Strategy's

road management standard RF-2(d), which holds that existing and planned roads should "avoid sediment delivery to streams from the road surface."  05-107 AR 113-2 at A-8.

### 3.     Discussion

The first thing to consider is the Forest Service's argument that the Fish Strategy is merely a "policy," and that it cannot supersede the Forest Service's obligation to allow mining under the Organic Act, 16 U.S.C. § 478.  That statute states that nothing in Sections 473-482 and 551 of Title 16 prohibit any person from entering the national forests for lawful means, "including that of prospecting, locating, and developing the mineral resources thereof."  The Forest Service argument ignores the last sentence of the statute, which provides that anyone entering the national forests, including for purposes related to mining, "must comply with the rules and regulations covering such national forests."  16 U.S.C. § 478.

The Forest Service has not spotted a statute that excuses the agency from the requirement that it follow its Forest Plan.  The Fish Strategy applies to this project as a valid provision of the Forest Plan and the agency's decision will be set aside if the Plaintiffs show that the decision violates the Forest Plan.  See Native Ecosystems Council v. United States Forest Service, 418 F.3d 953, 962 (9th Cir. 2005) ("An agency's position that is contrary to the clear language of a Forest Plan

is not entitled to deference.").  It is a different question whether the Fish Strategy's language imposes substantive requirements that are as absolute as the Plaintiffs contend.  That points are addressed below.

### a.    Standard MM-1

The Plaintiffs claim a general violation of standard MM-1 based on their insistence that the 2003 Record of Decision does not require Revett to take "all practicable measures" to maintain, protect, and rehabilitate fish and wildlife habitat which may be affected by the operations.  This claim is duplicative of the Organic Act claim analyzed above, in which Plaintiffs alleged that the Forest Service failed to fulfill its regulatory obligation to require Revett to "take all practicable measures to maintain and protect fisheries and wildlife habitat which may be affected by the operations."  Because the Organic Act analysis resolves these arguments, the nearly identical NFMA claim based on MM-1 is not discussed in any further detail here.

### b.    Standard MM-2

The project violates standard MM-2, Plaintiffs say, because the Forest Service has allowed Revett to locate structures, support facilities and roads in Conservation Areas and has failed to require Revett to locate and construct the facilities in ways that "avoid impacts to Riparian Habitat Conservation Areas and streams and adverse effects on inland native fish."  05-107 AR 113-2 at A-10.  To

signal that mine structures and facilities will be constructed Conservation Areas,

Plaintiffs rely entirely on Figure 4-4 of the Final Environmental Impact Statement,

which they say shows "pipelines, roads and other structures" within Conservation

Areas.  In fact Figure 4-4 shows that there are two roads located in Conservation

Areas, along with the mill site.  05-107 AR 88-2 at 4-129.  The legend for Figure

4-4 states that some roads and other mine facilities do not appear due to scale

limitations.  Id.

As to these facilities, Plaintiffs emphasize the Forest Service's discussion of

the MM-2 standard in the environmental consequences section of the  Final

Environmental Impact Statement, where the agency states:

> Standard MM-2 specifies that adverse impacts to riparian zones and
> fish from the construction of roads and facilities should be avoided.
> As noted above in the sediment subsection, it is likely that some
> sediment would be deposited in Rock Creek from construction
> activities within the riparian zone (see Figure 4-4).  Because sediment
> fines are already relatively high in some Rock Creek spawning
> gravels, increased sediment loading could adversely affect inland
> native fish.  Specific mitigations proposed as part of the road
> construction design would satisfy the overall goals and objectives of
> [the Fish Strategy] even if this specific standard is not met.

05-107 AR 88-2 at 4-128.  That language comes from a discussion of the

environmental consequences of Alternative II, which was not the chosen

alternative.  In discussing Alternative V, the selected alternative, the Forest

Service states in the environmental consequences section, "Alternative V would

comply with [Fish Strategy] standards and guidelines.  Through a combination of

relocation of some activities and additional sediment mitigation, Standard MM-2 would be met."  05-107 AR 4-134.

Plaintiffs complain that the Forest Service did not review alternatives to placement of the structures and facilities in Conservation Areas as required by standard MM-2, alleging the agency only reviewed "four overall alternatives of mine design" in the Final Environmental Impact Statement.  Doc. No. 115 at 15.

The record contradicts this assertion.  The Forest Service identified 24 potential mill/portal sites, narrowed that number to seven based on several criteria, and ultimately concluded that three sites warranted further evaluation.  05-107 AR 30-8 at 11-12; 05-107 AR 88-2 at 2-6.  Of those three, two were fully analyzed among the five project alternatives in the Final Environmental Impact Statement. The Forest Service explains the reasons why it eliminated potential mill/portal sites in the Final Environmental Impact Statement.  05-107 AR 88-2 at 2-161 to 2-162.[20]  The agency also identified 21 potential tailings impoundment sites, 05-107

---

[20]The Final Environmental Impact Statement's section describing alternatives states:

> Site J was considered, but was dismissed from further study because it was more visible from the wilderness and FDR No. 150 than Alternatives III and IV and offered no distinct resource-related advantage over a mine portal at Site K....  The East Fork Rock Creek sites did not offer any advantages over alternatives included in the [environmental impact statement].  The Bull River sites were not considered in detail because of distance from portal locations, grizzly bear habitat, and the relatively pristine nature of the potentially affected drainage.

05-107 AR 88-2 at 2-161 to 2-162.

AR 30-8 at 13-14, before narrowing the number of options to four to correspond to the remaining mill site alternatives.  05-107 AR 88-2 at 2-6.  The tailings impoundment alternatives were then reviewed anew to analyze their potential for paste deposition, resulting in two sites that were analyzed among the five project alternatives in the Final Environmental Impact Statement.  Id. at 2-8, 2-9.  The Forest Services explains its reasons for narrowing the tailings paste disposal site options.  05-107 AR 88-2 at 2-162 to 2-169.  The review of alternatives satisfies the Fish Strategy standard MM-2 requirement that the agency review alternatives to placement in a Conservation Area.

Plaintiffs next reason that even if the Forest Service complied with its obligation to review alternatives before allowing structures in a Conservation Area, the agency nonetheless violated standard MM-2 by failing to "locate and construct the facilities in ways that avoid impacts to Riparian Habitat Conservation Areas and streams and adverse effects on inland native fish."  05-107 AR 113-2 at A-10.

The discussion of Plaintiffs' Organic Act and NEPA claims reveals that the Forest Service took substantial steps to ensure adverse impacts to bull trout were mitigated.  Plaintiffs insist that such mitigation efforts are of no significance here because it is undeniable that the project will result in some adverse impacts on bull trout.  Plaintiffs read the Fish Strategy as imposing an absolute ban on any activity

that will have a detrimental effect on bull trout populations or habitat.  Such a

reading is too sweeping and it is more than the Fish Strategy requires.  The

argument pivots on the MM-2 language requiring the Forest Service to "locate and

construct the facilities in ways that avoid" adverse impacts.  Taken out of context

the provision plausibly supports an inference of a strict substantive prohibition on

structures that will cause any harmful effects to the fishery, although the language

is fairly open to less stringent interpretations as well.  But a broad reading of MM-

2 is fatally undermined by the caveat on the first page of the Fish Strategy that the

document is not to be used to "lockout" any project or activity from Conservation

Areas, but only requires "proper analysis...prior to initiation of projects."[21]  05-107

AR 113-2 at A-1.  The Forest Service conducted a proper analysis, it determined

that no viable alternative exists to locating identified facilities in Conservation

---

[21]There is a fair argument to be made that while the Fish Strategy is not intended to
"lockout" any projects on a permanent basis, it may be used to halt a project during the 18-month
"interim" period during which the Fish Strategy was initially expected to apply.  The document
states that the Fish Strategy "could lead to deferring or suspending some resource management
projects and activities...during the interim period."  05-107 AR 113-2 at A-1.  The implication
seems to be that under the original intended function and life span of the Fish Strategy, certain
projects may be held up (for no more than 18 months) in order to preserve habitat in its then-
current state pending completion of a long-term programmatic management document.  This
inference is supported by the Decision Notice for the Fish Strategy, which states that the interim
management is intended to "maintain options for inland native fish by reducing risk of loss of
populations and reducing potential negative impacts to aquatic habitat."  Doc. No. 91-2 at 5.
Assuming this construction accurately captures the intent of the Fish Strategy, the apparent delay
in producing a long-term management document, which may be continuing to this day, creates
complications for the application of the Fish Strategy as an interim document.  The prospect of
"deferring or suspending" a project during an 18-month interim period is one thing; the same
deferral or suspension takes on a very different meaning if the "interim" period extends
indefinitely, to the point where it might be accurately characterized as a "lockout."

Areas, and it required extensive efforts to avoid adverse impacts to bull trout.  Fish

Strategy standard MM-2 requires nothing more.[22]

### c.    Standard MM-3

Plaintiffs hold the Forest Service violated standard MM-3 by allowing

Revett to locate mine waste in a Conservation Area without (1) analyzing the

waste material using the best conventional methods; or (2) ensuring that the

facility is stable and releases can be prevented.

The mill site under the selected Alternative V will include a waste rock

dump.  05-107 AR 88-2 at 2-88, 2-90, 2-100.  The Forest Service ignores this fact

entirely in its briefing and instead devotes its argument to showing that the tailings

paste facility near the Clark Fork River will comply with standard MM-3.  Revett

beards the issue by acknowledging that waste rock will be present at the mill site,

but then claiming that Figure 2-25 of the Final Environmental Impact Statement

shows that no facilities are located within Conservation Areas.  Figure 2-25 shows

that the Forest Service laid out the mill site to provide a 300-foot buffer for each

fork of Rock Creek.  Id. at 2-89, 2-90.  However, that graphic does not admit a

Conservation Area that is shown on Figure 4-4 and appears to run through the

_____

[22]This reasoning also applies to dispose of Plaintiffs' argument that the Forest Service, despite its detailed mitigation plans, violated road management standard RF-2(d), which states that existing and planned roads should "avoid sediment delivery to streams from the road surface."  05-107 AR 113-2 at A-8.  That standard does not require the Forest Service to reject a project simply because it will result in some sediment delivery from the road surface.

middle of the mill site.  Id. at 4-129.  The Conservation Area running through the

mill site is labeled a Category 4 area, with this corresponding definition:

"Seasonally flowing or intermittent streams, wetlands less than 1 acre, landslides,

and landslide prone areas."  Id.  The Conservation Area extends to 100 feet from

the edge of the area.  Id.  Thus, while the Forest Service and Revett were careful to

stay clear of Rock Creek in the placement of mill site facilities, it is a different

question whether they avoided all Conservation Areas.[23]

Figures 2-25 and 4-4, when viewed together, leave a chink in the necessary

information to evaluate this claim.  A Conservation Area runs through the mill

site, but there is nothing in the record to show where the waste rock dump at the

mill site is located  or where the Conservation Area in question lies in relation to

the facilities at the mill site.  The entire mill site contains only three small

wetlands covering less than one tenth of one acre, making it unlikely that the

waste rock dump is in a Conservation Area.  05-107 AR 4-118.  The parties were

unable to clarify this matter at the hearing on March 17, 2010.  Because this matter

will be remanded to the agency on other grounds, the Forest Service will be

---

[23]At the March 17, 2010, hearing, Counsel for the Forest Service attempted to downplay the importance of the Category 4 Conservation Area, arguing that it is not entitled to a 300-foot buffer like the one applied to Rock Creek.  The assertion is true as far as it goes, but nothing in standard MM-3 makes the protection afforded to Conservation Areas contingent upon those areas actually consisting of high-quality aquatic habitat.  Standard MM-3 applies to all Conservation Areas, regardless of their actual condition, which means waste rock may not be placed in the Category 4 Conservation Area within the boundaries of the mill site.

required on remand to include in the record a map of sufficient detail to allow a

determination of the location of the "Waste Dump Area"[24] in relation to the

Conservation Area running through the mill site.

**E.     ESA (Counts I and II, lead case; Counts I and II, companion case)**

**1.     Legal Standard**

Section 7(a)(2) of the Endangered Species Act requires federal agencies to

consult with the Fish and Wildlife Service or the NOAA Fisheries Service[25] to

ensure that any action authorized, funded or carried out by the agency is not likely

to jeopardize the continued existence of any endangered species or threatened

species or result in destruction or adverse modification of critical habitat for such

species.[26]  16 U.S.C. § 1536(a)(2).  The statute enacted by Congress and its

implementing regulations establish a framework for assessing the impacts of a

proposed activity on listed species.  16 U.S.C. § 1536; 50 C.F.R. Part 402.

---

[24]Table 2-10, on page 2-90 of the Final Environmental Impact Statement, states that a "Waste Dump Area" is "included in [the] mill site."  05-107 AR 88-2 at 2-90.

[25]The ESA consulting agency at issue in this case is the Fish and Wildlife Service.

[26]The ESA defines "critical habitat" in part as:

the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection[.]

16 U.S.C. § 1532(5)(A)(i).

An agency proposing an action must first determine whether the action

"may affect" species listed as endangered or threatened under the ESA.  50 C.F.R.

§ 402.14(a).  If it determines that the proposed action may affect listed species,

formal consultation with the Fish and Wildlife Service is required except in certain

instances.  Id.  The relevant exceptions in this case allow an action agency to

forego formal consultation

> if, as a result of the preparation of a biological assessment under §
> 402.12[27] or as a result of informal consultation with the Service under
> § 402.13,[28] the Federal agency determines, with the written
> concurrence of the Director, that the proposed action is not likely to
> adversely affect any listed species or critical habitat.

50 C.F.R. § 402.14(b)(1).

Formal consultation means the Fish and Wildlife Service has to prepare a

biological opinion in which the Service advises a federal agency as to whether the

proposed action, considered alone or considered cumulatively with other actions,

---

[27] 50 C.F.R. § 402.12(a) states that a biological assessment "shall evaluate the potential
effects of the action on listed and proposed species and designated and proposed critical habitat
and determine whether any such species or habitat are likely to be adversely affected by the
action and is used in determining whether formal consultation or a conference is necessary."

[28] 50 C.F.R. § 402.13(a) provides:

Informal consultation is an optional process that includes all discussions,
correspondence, etc., between the Service and the Federal agency or the
designated non-Federal representative, designed to assist the Federal agency in
determining whether formal consultation or a conference is required. If during
informal consultation it is determined by the Federal agency, with the written
concurrence of the Service, that the action is not likely to adversely affect listed
species or critical habitat, the consultation process is terminated, and no further
action is necessary.

is likely to jeopardize the continued existence of[29] any listed species or is likely to

result in the destruction or adverse modification of any critical habitat.  50 C.F.R.

§ 402.14(h)(3).  If the Fish and Wildlife Service determines that a proposed action

is likely to result in jeopardy or loss of critical habitat, then it must set forth

reasonable and prudent alternatives to the action, if any.  16 U.S.C. §

1536(b)(3)(A).  If it is determined that a proposed action will result in incidental

take of listed species but that the action and associated incidental take will not

violate the ESA Section 7 jeopardy standard, the Service must attach an incidental

take statement to the biological opinion.[30]  16 U.S.C. § 1536(b)(4); 50 C.F.R.

402.14(i)(1).  The incidental take statement sets forth the predicted impact to listed

species, the reasonable and prudent measures that are necessary to minimize take,

and the terms and conditions for the implementation of those measures.  Id.  If the

action agency complies with the terms and conditions of the incidental take

statement, the expected take is exempted from the take prohibition set forth in

ESA Section 9 (16 U.S.C. § 1538(a)(1)(B)).  16 U.S.C. § 1536(o)(2).  In its

biological opinion, the Fish and Wildlife Service "must state a rational connection

---

[29]50 C.F.R. § 402.02 provides that "'Jeopardize the continued existence of' means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."

[30]The term "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in such conduct."  16 U.S.C. § 1532(19).

between the facts found and the decision made." <u>Gifford Pinchot Task Force v.</u>
<u>United States Fish and Wildlife Service</u>, 378 F.3d 1059, 1065 (9th Cir. 2004)
("<u>Gifford Pinchot</u>").

While consultation is ongoing, ESA Section 7(d) prohibits action agencies
from making an "irreversible or irretrievable" commitment of resources "which
has the effect of foreclosing the formulation or implementation of any reasonable
and prudent alternative" to the agency action.  16 U.S.C. § 1536(d).  This
debarment is effective upon initiation of consultation and continues until
consultation is concluded.  <u>Id.</u>; 50 C.F.R. § 402.09.

In actions where the federal agency remains in control or where the federal
agency has discretionary involvement, re-initiation of formal consultation is
required in the following instances:

> (a) If the amount or extent of taking specified in the incidental take
> statement is exceeded;
>
> (b) If new information reveals effects of the action that may affect
> listed species or critical habitat in a manner or to an extent not
> previously considered;
>
> (c) If the identified action is subsequently modified in a manner that
> causes an effect to the listed species or critical habitat that was not
> considered in the biological opinion; or
>
> (d) If a new species is listed or critical habitat designated that may be
> affected by the identified action.

50 C.F.R. § 402.16.

## 2.    The Plaintiffs' Claims

Plaintiffs allege one Section 7 ESA claim in Count I of the lead case, reasoning the Forest Service violated Section 7(d) by making an "irreversible or irretrievable" commitment of resources before completing formal consultation with the Fish and Wildlife Service.

In Count I of the companion case Plaintiffs allege the Fish and Wildlife Service violated Section 7(a)(2) with its "no jeopardy" determination for grizzly bears.  Count II of the companion case states an ESA Section 7(a)(2) claim with respect to bull trout, maintaining the agency acted arbitrarily and capriciously when it concluded that the mine project would not jeopardize the continued existence of bull trout and would not result in adverse modification to critical habitat for bull trout.

Count II of the lead case asserts an ESA Section 9 violation against the Forest Service for a taking without a valid exemption.  The Plaintiffs did not brief this claim, which is apparently predicated on the success of the companion case claims alleging the Fish and Wildlife Service violated ESA Section 7.

## 3.    ESA Section 7(d) Claim Against the Forest Service (Count I, lead case)

The Plaintiffs in the lead case make one ESA claim against the Forest Service, insisting the agency violated Section 7(d) of the ESA because it made an

"irreversible or irretrievable" commitment of resources in approving the mine

project even though the Fish and Wildlife Service has a continuing role in

approving mitigation parcels to be acquired for the grizzly bear and in mitigation

plans to be approved for bull trout. Plaintiffs reason consultation has not

concluded and therefore Section 7(d)'s prohibition on irreversible or irretrievable

commitment of resources remains in effect because of the Fish and Wildlife

Service's continuing involvement. They contend that under Section 7(d) the

ground cannot be disturbed until all parcels of grizzly mitigation lands are

acquired and all sediment mitigation plans are reviewed and approved.

No authority supports the Plaintiffs' position. Section 7(d) is meant to

preserve the status quo during the consultation process. Conner v. Buford, 848

F.2d 1441, 1455 n.34 (9th Cir. 1988). "Formal consultation is terminated with the

issuance of the biological opinion." 50 C.F.R. § 402.14(l)(1); see also Natural

Resources Defense Council v. Kempthorne, 539 F. Supp. 2d 1155, 1177 (E.D. Cal.

2008) ("The § 7(d) focus is on [the agency]'s act of issuing the no

jeopardy/adverse modification biological opinion, not whether such biological

opinion withstands a legal challenge some time in the future.").

Plaintiffs cite no authority for their argument that the Section 7(d)

prohibition on irreversible or irretrievable commitment of resources extends

beyond the issuance of a "no jeopardy/no adverse modification" biological

opinion.  If Revett and the Forest Service fail to do what the 2006 Biological

Opinion and 2007 Supplement require, they may find themselves in violation of

ESA Section 9's prohibition on unauthorized take, but that is not the situation

confronting the Court now.  Rock Creek Alliance, 390 F. Supp. 2d at 1009-1010.

**4.     Bull Trout (Count II, Companion Case)**

**a.     Background on Bull Trout**

The Fish and Wildlife Service has identified five distinct population

segments of bull trout in the coterminous United States.  64 Fed. Reg. 58910,

58912.  The Columbia River distinct population segment, of which Rock Creek is

a part, was listed as threatened in 1998, 63 Fed. Reg. 31647.  Through successive

listings all five distinct population segments were listed as threatened by the end

of 1999, resulting in the de facto listing of the entire bull trout population in the

coterminous United States.  64 Fed. Reg. 58912.  At that time the Fish and

Wildlife Service wrote:

> [T]he [distinct population segment] policy ... is intended for cases
> where only a segment of a species' range needs the protections of the
> Act, rather than the entire range of a species.  Although the bull trout
> [distinct population segment]s are disjunct and geographically
> isolated from one another with no genetic interchange between them
> due to natural and man-made barriers, collectively, they include the
> entire distribution of the bull trout in the coterminous United States.
> In accordance with [distinct population segment] policy, our authority
> to list [distinct population segment]s is to be exercised sparingly.
> Thus a coterminous listing is appropriate in this case.  In recognition
> of the scientific basis for the identification of these bull trout

> population segments and [distinct population segment]s, and for the
> purposes of consultation and recovery planning, we will continue to
> refer to these populations as [distinct population segment]s. These
> [distinct population segment]s will serve as interim recovery units in
> the absence of an approved recovery plan.

Id. There is a draft recovery plan for the Columbia River distinct population

segment, but no final recovery plan has been approved.

In 2005, the Fish and Wildlife Service published a rule designating critical

habitat for bull trout, including five segments along Rock Creek totaling 2.88

miles. 70 Fed. Reg. 56271-56273. The designation of critical habitat triggers the

Fish and Wildlife Service's responsibility to provide consultation on the

likelihood that a proposed action will result in "destruction or adverse

modification" of critical habitat, in addition to assessing the likelihood of jeopardy

to the continued existence of the species. 16 U.S.C. § 1536(a)(2). The five

designated critical habitat segments are all located near mine-related facilities,

including roads. 05-107 AR 126-2 at B-17. The 2007 Supplement identifies eight

primary constituent elements for bull trout habitat. Id. at B-64 to B-65. One of the

eight elements is "substrates of sufficient size, amount, and composition for

juvenile and egg survival." Id. at B-65. That primary constituent element is

directly affected by sediment. 05-107 AR 126-1 Appendix I at 4.

  **b. Critical Habitat**

    **i. The Conclusions of the 2006 Biological Opinion and**

**2007 Supplement**

The Fish and Wildlife Service concluded in the 2007 Supplement that the project is "not likely to destroy or adversely modify bull trout critical habitat."  05-107 AR 126-2 at B-90.  The agency gave the following description of the likely effects on critical habitat:

> As proposed, implementation of the Rock Creek mine is anticipated to negatively impact designated critical habitat in Rock Creek by diminishing the function of some of the [primary constituent element]s due to increases in sedimentation in the West Fork and mainstem of Rock Creek and to a lesser extent critical habitat in the East Fork Rock Creek. Activities in the action area associated with the proposed mining operation would likely degrade aquatic habitat including spawning habitat, rearing habitat, and food supply and impact all bull trout life history stages during the 5-year construction period and likely for two years after construction is completed. Thereafter, the effects from sedimentation should subside and levels of sedimentation are expected to return to those observed before construction. Increases in sedimentation, water quality degradation, and changes in channel and habitat complexity related to mining activities are anticipated to reduce the functional ability of critical habitat to a small degree below baseline conditions temporarily, for about five to seven years associated with the construction period. The areas of critical habitat mostly affected in Rock Creek would be small localized stream segments in close proximity to the project area. All the primary constituent elements in Rock Creek are expected to remain functional, albeit at a lower level.

Id. at B-90.

The agency based its finding "on the magnitude of the project effects in relation to the designated critical habitat at the Columbia River basin scale."  05-107 AR 126-2 at B-90.  The agency stressed that critical habitat in Rock Creek

comprises 2 percent of the Lower Clark Fork Core Area's stream miles and 0.1 percent of the Columbia River basin's stream miles of critical habitat. <u>Id.</u> at B-91. Other factors cited to support the conclusion include expected continued functionality of all primary constituent elements in Rock Creek and the benefits of fish passage systems. <u>Id.</u>

The Plaintiffs contend the Fish and Wildlife Service violated Section 7(a)(2) of the ESA when it determined that the mine project would not result in adverse modification to bull trout habitat, in light of the agency's own prediction that the project will have adverse effects on an already degraded habitat.

### ii.    Assessment of Impact on Recovery

The analysis of this claim begins with Plaintiffs' argument that the Fish and Wildlife Service failed to take into account the project's impact on the value of critical habitat for bull trout recovery. Following the Ninth Circuit's decision in <u>Gifford Pinchot</u>, adverse modification to critical habitat occurs when an action causes "appreciable diminishment" of the value of critical habitat for survival *or* recovery. 378 F.3d at 1069-70 (invalidating regulation that effectively confined adverse modification analysis to affects on survival only). "Requiring some attention to recovery issues ... provides some reasonable assurance that the agency action in question will not appreciably reduce the odds of success for future recovery planning, by tipping a listed species too far into danger." <u>National</u>

Wildlife Federation v. National Marine Fisheries Service, 524 F.3d 917, 936 (9th Cir. 2008) ("National Wildlife").  Plaintiffs say the 2007 Supplement runs afoul of Gifford Pinchot because it addresses only survival and contains "no discussion" of the impact of the mine project on recovery.  Doc. No. 86 at 9.

The best counter to the Plaintiffs' position is that the 2007 Supplement explicitly states that its critical habitat analysis is guided by the Director's December 9, 2004, Memorandum issued in response to the Gifford Pinchot ruling. 05-107 AR 126-2 at B-90.  The Director's Memorandum, incorporated in the 2006 Biological Opinion as Appendix E, provides interim guidance on the consideration of adverse effects on critical habitat pending publication of a "new regulatory definition of 'destruction or adverse modification,'" and is meant to require discussion of conservation[31] in a way that corrects the deficiency in the regulation that was invalidated in Gifford Pinchot.  05-107 AR 126-1 Appendix E at 1.

The Plaintiffs insist the agency's mere assertion that it followed the Director's Memorandum is insufficient.  The Fish and Wildlife Service is entitled to a presumption of regularity which holds that the agency "must be presumed to have followed" its definition of adverse modification "unless rebutted by evidence in the record."  Gifford Pinchot, 378 F.3d at 1071.

---

[31]The Director's Memorandum uses the term "conservation" to refer to recovery.  05-107 AR 126-1 Appendix E.  The usage is consistent with the Ninth Circuit's Gifford Pinchot opinion. 378 F.3d at 1069-74.

In this instance the agency reasonably complied with the Director's Memorandum. In the "Status of the Species/Critical Habitat" analysis, the Director's Memorandum obligates the agency to identify primary constituent elements supporting critical habitat and to discuss the conservation role of individual critical habitat units. 05-107 AR 126-1 Appendix E at 2. The agency identifies the primary constituent elements "essential to the conservation of the bull trout" on page B-52 of the 2007 Supplement. In the "Effects of the Action" analysis, it should describe the effects of the action of the primary constituent elements, which the agency does on page B-82 of the 2007 Supplement. 05-107 AR 126-1 Appendix E at 2. The "Cumulative Effects" analysis discusses the aggregate impact of actions on the affected primary constituent elements on pages B-84 and B-85 of the 2007 Supplement, as required by the Director's Memorandum. 05-107 AR 126-1 Appendix E at 3. At pages B-90 and B-91, the 2007 Supplement complies with the mandate that the "Conclusion" section state whether the primary constituent elements will remain functional. Id.

In addition to the foregoing requirements, Paragraphs 1 through 4 of the Director's Memorandum call for a discussion of the role of the affected critical habitat units on the conservation of the species and the relation of the affected area of critical habitat to the entire designated critical habitat for the species. 05-107 AR 126-1 Appendix E at 2-3. Such considerations are not discretely presented in

the designated sections as contemplated by the Director's Memorandum, but

unfold throughout the 2007 Supplement as the fundamental proposition

underlying the agency's conclusion, i.e., the critical habitat at issue in this case is

such a minuscule portion of the overall critical habitat designated for the species

that its role in conservation of the species is negligible.  See, e.g., 05-107 AR B-86

to B-91.  The Plaintiffs emphasize the infrequent use of the words "recovery" and

"conservation" in the 2007 Supplement, but the results of the agency's analysis

with respect to recovery are unmistakable: by reducing (but not eliminating)

functionality of the primary constituent elements essential for conservation of bull

trout, the proposed action will have a harmful affect on bull trout recovery in the

Rock Creek critical habitat segments for the first five to seven years of the action.

Nonetheless, due to the small size of Rock Creek critical habitat in relation to the

total designated critical habitat, the value of overall critical habitat for recovery

will not be appreciably diminished.  05-107 AR B-90 to B-91.

The Plaintiffs objection is to the Fish and Wildlife Service's reliance on the

Rock Creek population's relative insignificance to the distinct population segment

in terms of fish demography and area; the agency's conclusion, in essence, is that

the Rock Creek critical habitat has little value for recovery because it is so small.

Plaintiffs disagree with the conclusion, and that issue is considered in the next

section of this order discussing whether the agency's "no adverse modification"

decision is arbitrary and capricious.  The question here is whether the agency gave adequate consideration to the impacts of the action on the value of core habitat for recovery.  While the agency could have done a better job of maintaining strict adherence to the Director's Memorandum in structuring its discussion of the effects on recovery that observation bears little significance in analyzing the question raised.  The discussion as presented is adequate under the ESA, particularly in light of the agency's conclusion conceding that the project will have harmful effects on the functionality of the primary constituent elements essential for bull trout conservation.

The lack of such explicit analysis on the Rock Creek critical habitat segments' value for conservation or recovery, coupled with the agency's undeniably half-hearted effort to adhere to the requirements of the Director's Memorandum, provides grist for concluding that the Fish and Wildlife Service fell short in its consideration or recovery.  The closeness of the question was articulated by the Ninth Circuit in National Wildlife: "We recognize that these concepts [survival and recovery] are generally considered together in analyzing effects, and it is difficult to draw clear-cut distinctions.  However, the agency may not resolve this difficulty by ignoring recovery needs and focusing entirely on survival, as it has claimed the right to do here."  524 F.3d  at 932 n.11 (citation, internal quotations omitted).  While the agency has not claimed such a right in this

case, it has provided very little discussion of recovery that is distinct from its discussion of survival.[32]

The disposition of this issue is a product of the agency's discussion of primary constituent elements coupled with the particular nature of the agency's determination and rationale; the agency concedes diminished function in elements essential to recovery, but concludes that the harm is too small to matter – while Plaintiffs may debate the ultimate conclusion (the legality of which is tested in the next section), the analysis considers the habitat's value to recovery with minimal but sufficient adequacy.

### iii.     The "No Adverse Modification" Conclusion

Adverse modification occurs when an action appreciably diminishes the value of critical habitat, either for survival or recovery.  <u>Gifford Pinchot</u>, 378 F.3d at 1069-70.  The Plaintiffs argue the Fish and Wildlife Service violated the ESA by failing to state a rational connection between the facts found with respect to critical habitat and the agency's determination that the action will not result in adverse modification to critical habitat.

The 2007 Supplement generally describes environmental baseline

---

[32]As an additional argument in defense of its consideration of impacts on value to recovery, the Fish and Wildlife Service emphasizes that much of its discussion of the effects on critical habitat takes place at the scale of the "core area" unit, which the Draft Bull Trout Recovery Plan describes as "the basic unit on which to gauge recovery."  05-107 AR 126-2 at B-5.

conditions for Rock Creek critical habitat as "deficient."  05-107 AR 126-2 at B-66.  Habitat conditions in the Rock Creek watershed are "degraded with relatively high levels of sediments present in the spawning gravels and periods of stream flow intermittence occurring in many years."  Id. at B-60.  Fine sediment levels are currently functioning "at-risk" for bull trout, which "could be limiting production. Nevertheless, it is difficult to determine if this is a limiting factor given several other habitat parameters are functioning at-risk, especially the nearly annual intermittent flows in the lowermost reach and much of the midsection in most years."  Id. at B-62 to B-63.  "The present amount of fine sediment in spawning substrate allows the current Rock Creek population to persist under these conditions, but the population may not improve unless levels of fine sediment decrease to a point where survival of bull trout eggs would increase."  Id. at 74. High levels of fine sediment lower the survival rate of eggs.  Id.  The Clark Fork River drainage has an average embryo-to-emergence survival rate of 33 percent; in the West Fork of Rock Creek the average is 40 percent, and in the Rock Creek main stem the average is 18 percent, which the agency calls "low."  Id.  "[V]ery little spawning habitat is available in Rock Creek."  Id.

Describing the effects of the mine on sedimentation, the 2007 Supplement says:

The highest levels of sediment loading are expected to occur during the 5-year construction period with significantly decreasing levels of

additional sediment entering the stream over the 35-year operating life of the mine. The increase in sediment loading is estimated to be 46% in the West Fork of Rock Creek, 20% in the East Fork of Rock Creek, and 38% overall for the entire Rock Creek watershed (USDA Forest Service 1999, MDEQ and USDA Forest Service 2001). These values are probably over estimates and likely present a worse-case [sic] scenario because of the parameters used in the modeling evaluation and because the evaluation did not include the proposed sediment abatement mitigation activities, which would occur before, during, and after construction. Further, sediment loading during this period would likely happen in pulses of short duration and be mainly localized to certain segments of particular reaches. The overall area affected would be confined to the mainstem Rock Creek and West Fork Rock Creek nearest the mine facilities and utility corridors.

05-107 AR 126-2 at B-73.

The potential increase in fine sediment during the five- to seven-year construction phase is "[t]he most obvious direct impact of the construction and operation of the Rock Creek Mine to bull trout." 05-107 AR 126-2 at B-73. According to the agency, the effect of increased fine sediment on the population cannot be predicted with precision "because some populations are more sensitive than others." Id. at B-75. An increase "could adversely affect all five sections of designated bull trout critical habitat" by decreasing "the habitat's ability (and [primary constituent element]s) to support several life stages of bull trout within the action area[.]" Id. at B-84. "Increases in sediment that result in changes in habitat complexity could be considered more than insignificant or inconsequential to critical habitat in the watershed." Id. The agency's conclusion, excerpted in full above, is that increased sedimentation will "negatively impact" Rock Creek

critical habitat by "diminishing" the functionality of several primary constituent elements, but will have a "diminutive" impact on critical habitat at the much larger scales of the Lower Clark Fork Core Area and the Clark Fork River Management Unit, and therefore will not result in adverse modification.  Id. at B-90.

The 2007 Supplement describes a small area of critical habitat that is degraded primarily due to low stream flow and excess fine sediment, but is functioning at a level sufficient to sustain the current population.  When Rock Creek critical habitat is considered in isolation, there is ample ground to conclude that increased sediment loading, including a 46 percent increase associated with the Phase I adit, will appreciably diminish the value of the local critical habitat for recovery, and possibly survival, during the five- to seven-year construction period. Despite the solid evidence for at least a temporary appreciable diminishment of the local critical habitat, the agency makes a "no adverse modification" determination because (1) the worst effects of the expected disturbance will not last more than seven years; (2) the affected area is very small in relation to the core area; and (3) all primary constituent elements will remain functional, even if diminished.  The question is whether the agency may properly rely on these factors (referred to below as "duration," "scale," and "functionality") in making its determination. The parties largely agree as to which cases control.

In National Wildlife, the circuit considered a biological opinion evaluating

the effects on thirteen listed species of a ten-year plan for continued operation of

dams on the lower Snake and Columbia Rivers.  524 F.3d at 922-23.  The National

Marine Fisheries Service issued a "no adverse modification" determination with

respect to critical habitat, despite finding that the proposed action would have

significant negative effects on the listed species' "perilous" condition.  Id. at 926-

27.  The court of appeals found the agency's conclusions arbitrary and capricious

with respect to two species, holding that the agency improperly discounted the

harmful short-term effects of the first five years of the action.  Id. at 935.  For the

Snake River Spring/Summer Chinook, the panel noted that the agency anticipated

a "significant negative impact on 'the essential habitat feature of safe passage'" in

the first five years.  Id.  For the Snake River sockeye, the agency expected

"significant" impairment of safe passage and lower survival throughout the entire

action, and found the current conditions to be "extremely poor."  Id.  The panel

also discounted the agency's reliance on mitigation measures, saying a "sincere

general commitment to future improvements" is inadequate, and "specific and

binding plans" are required.  Id. at 936.  The court of appeals concluded that the

agency "did not adequately demonstrate that [short-term] impacts would not affect

the fishes' survival and recovery, in light of their short life-cycles and current

extremely poor habitat conditions."  Id. at 935.

     National Wildlife provides some support for the Plaintiffs' position on the

issues of duration and, to a lesser extent, functionality.  The case encourages the

Plaintiffs' position on duration because the court prohibited the agency from

basing its conclusion on minimal long-term impacts despite serious short-term

harm to critical habitat.  The case is less helpful to Plaintiffs on the question of

functionality, as the agency in National Wildlife found "significant" negative

impacts to critical habitat that was already in "extremely poor" condition.  Here,

the agency anticipates some decrease in functionality, and concedes a potential for

significant localized impacts, but it does not predict the level of harm described in

National Wildlife.  But, the current conditions here are not as degraded here as

they were in National Wildlife.  As for the scale factor, National Wildlife is

distinguishable and provides no support for the Plaintiffs.  The agency in National

Wildlife predicted significant negative impacts throughout the entirety of the listed

species' critical habitat.  Here only a small fraction of critical habitat is involved.

The case does not negate the 2007 Supplement's reliance on large-scale analysis.

National Wildlife is further distinguishable because the agency here relied on

specific and binding mitigation plans in reaching its conclusion.

Plaintiffs then cite Nez Perce Tribe v. NOAA Fisheries, 2008 WL 93840 (D.

Idaho), in which the district court rejected a biological opinion finding no adverse

modification resulting from a city irrigation system.  Id. at *3.  The agency had

concluded that the habitat for the affected population of steelhead  was "largely in

poor or non-functioning condition," and that the action would negatively impact

habitat by reducing stream flows.  Id. at *3, *5.  The opinion also found that the

entire listed species was in a "long-term decline."  Id. at *5.  The district court

noted that mortality had recently exceeded reproductive success in the affected

area.  Id. at *8.  The agency argued that due to the relatively small size of the

action area and the abundance of other good habitat available, the action would

not appreciably diminish the value of critical habitat.  Id. at *9.  The district judge

rejected the argument based on his finding that "incremental harms are accruing at

an alarming rate."  Id. at *6.  The court stated:

> In its Biological Opinion, NOAA found that habitat quality
> throughout the area occupied by the CRLMA population is largely in
> poor or non-functioning condition.  Thus, good habitat is not
> abundant elsewhere.  This wide-spread degradation of habitat means,
> according to NOAA, that each additional increment of habitat loss
> could result in an exponential increase in the extinction risk.  Given
> these findings, the Court cannot conclude that the action area is too
> small to matter.

Id. at *10 (citations, internal quotations omitted).

The Nez Perce opinion provides some helpful analysis on functionality and

scale, but none as to duration.  For functionality, the situation in Nez Perce

involved much worse baseline conditions and much more serious effects than are

present in this case.  The critical habitat at issue here is functional and sustaining

populations.  There is no suggestion that the degradation of habitat in Rock Creek

could result in an exponential increase in the risk of extinction.  The case's impact

on the scale factor is more complicated.  The Idaho court rejected the agency's reliance on scale to reach a "no adverse modification" decision, but the ruling is predicated on a finding of "widespread degradation of habitat" from incremental harms "accruing at an alarming rate." Id. at *6, *10.  There is no evidence of widespread degradation from cumulative effects here.  Moreover, it is difficult to apply Nez Perce to the question of whether an agency may properly rely on a large-scale analysis because the opinion does not make clear the relationship between the area of affected critical habitat and the area of the total critical habitat.

In Center for Biological Diversity v. Bureau of Land Management, 422 F. Supp. 2d 1115, 1136 (N.D. Cal. 2006), the district court invalidated a "no adverse modification" biological opinion where the agency expected "continued and expanded" degradation to 48 percent of the designated critical habitat for the milk vetch.  The court also reasoned that the mitigation measures upon which the agency relied would be deferred until after the degradation had taken place.  Id. Center for Biological Diversity is distinguishable from this case as to the scale factor; the action in Center did not degrade a small percentage of critical habitat. It affected nearly half of all designated critical habitat for the listed species.  What is less clear is whether the opinion is distinguishable as to functionality, as the agency's finding of "continued and expanded habitat degradation" does not

convey the degree of the expected degradation.[33]  The district court's disapproval

of the agency's reliance on deferred mitigation has some application here as it

relates to the expected increase in sedimentation during the Phase I evaluation

adit, before the 400-ton sediment source reduction requirement takes effect.

The case closest to being on point with respect to the agency's reliance on

large-scale analysis is Gifford Pinchot.[34]  The circuit panel in that case squarely

addressed the Fish and Wildlife Service's decision to analyze critical habitat on a

large scale:

> Appellants object to the scale of the critical habitat analysis area used
> for the three 'programmatic' [biological opinions].  Using the
> 'landscape' scale in the [biological opinions], the [agency] examined
> degradation to the critical habitat but, because of the huge scale of
> untouched forest, considered that the critical habitat would not be
> adversely modified.  Focusing solely on a vast scale can mask
> multiple site-specific impacts that, when aggregated, do pose a
> significant risk to a species.  Here, the three programmatic [biological
> opinions] evaluated the impact of the loss or degradation of 20,000
> acres of critical habitat within the context of six million acres of
> federal land.  We consider whether this masked the true impact of the

---

[33]Plaintiffs' citation to the district court case National Wildlife Federation v. National Marine Fisheries Service, 235 F. Supp. 2d 1143 (W.D. Wash.2002), provides little guidance on the question of scale for the same reason.  It is not clear from the opinion what percentage of the Snake River Fall Chinook's habitat would have been affected.

[34]Plaintiffs rely on Oregon Natural Desert Association v. Lohn, in which the district court stated it was "bothered by [the agency's] reference to 'rangewide' effects on critical habitat," and added, "nothing in the statute as far as I can tell permits adverse modification of critical habitat on a unit by unit basis."  485 F. Supp. 2d 1190, 1198 n.6 (D. Or. 2007).  Gifford Pinchot controls over Lohn because (1) Lohn is a district court case; (2) the judgment in Lohn was vacated and the case was dismissed as moot, 2007 WL 2377011 (D. Or.); and (3) the district court in Lohn explicitly stated that the scale argument was not briefed and not relevant to the decision.  485 F. Supp. 2d at 1198 n.6.

approved projects.

The [agency] responds that the [biological opinions] did consider local impacts, including, most importantly, connectivity issues.  After a careful review of the record, we conclude that the [agency] is correct.  The [biological opinions] considered the important local effects, analyzing critical habitat more broadly when individual effects were not important.  Appellants do not show that material local effects were missed, but merely point out that large scale analysis can pose a risk of masking.  The possibility of risk alone here does not mean that the agency's decision-making was arbitrary and capricious, an abuse of discretion, or contrary to law.  Without evidence in the record supporting that some localized risk was improperly hidden by the use of large scale analysis, we will not second-guess the [agency].

378 F.3d at 1075.

The Fish and Wildlife Service's reliance on scale in its critical habitat analysis in this case is consistent with the reasoning of Gifford Pinchot.  The agency did not attempt to hide the local impacts of the action, but considered them in detail.  The Plaintiffs point to no evidence in the record that multiple site-specific impacts, when aggregated, will pose "a significant risk" to the species.  The court in Gifford Pinchot found the use of a large-scale analysis was permissible despite the expected "loss or degradation" of 20,000 acres of designated critical habitat.  Id. at 1075.  A reasonable conclusion to be drawn from Gifford Pinchot is that degradation, or even elimination, of critical habitat on a small scale does not constitute adverse modification, provided (1) the affected area is insignificant relative to the total designated critical habitat; (2) the localized

effects are fully discussed in the biological opinion; and (3) the use of a large-scale analysis does not mask multiple site-specific effects that pose a significant risk to the species when considered in the aggregate.  This view is consistent with Nez Perce, where the district court rejected an argument that the affected area was "too small to matter" in light of the "widespread degradation of habitat" resulting from the accrual of incremental harms.  2008 WL 93840 at *6, *10.

Taken together, these cases confirm that the Fish and Wildlife Service's "no adverse modification" determination is rationally based on considerations that are permissible under the law.  The effects on functionality of critical habitat have less import in this case than in National Wildlife and Nez Perce, and in those cases the affected areas were in worse condition.  The agency cannot rely on the short-term duration of the harmful effects in this case, as such reasoning is foreclosed by National Wildlife; adverse modification may not be excused on the grounds that it will only last for seven years.  All this means, however, is that short-term effects cannot be ignored; it has no bearing on the validity of the agency's reliance on a large-scale analysis.  In this respect, the factors of functionality and duration are somewhat secondary considerations, because they merely serve to soften the negative effects on localized critical habitat.  Where large-scale critical habitat analysis is properly relied upon as contemplated by Gifford Pinchot, the negative effects on localized critical habitat become largely irrelevant; even the loss of

critical habitat can result in a "no adverse modification" determination if large-scale analysis is properly relied upon in accordance with Gifford Pinchot. Moreover, in this case Rock Creek critical habitat will suffer diminished functionality in the short term, but it will not be so degraded that it becomes non-functioning.

The Fish and Wildlife Service has stated a rational connection between the facts found and the decision made in a manner that is permissible under Ninth Circuit case law.  Summary judgment in favor of the Federal Defendants and Revett is GRANTED with respect to the Plaintiffs' challenge to the "no adverse modification" finding for bull trout critical habitat.

### c.    The "No Jeopardy" Conclusion

#### i.    The Conclusions of the 2006 Biological Opinion and 2007 Supplement

The Fish and Wildlife Service issued a "no-jeopardy" opinion for bull trout in the 2007 Supplement.  05-107 AR at B-86 to B-89.  The determination was made "at the scale of the listed entity, which is the coterminous United States population."  Id. at B-86.  However, in explaining its approach the Fish and Wildlife Service said it followed a "hierarchical" analysis, in which it considered the effects of the proposed action from "the lowest level or smallest scale (local population) toward the highest level or largest scale (Columbia River Interim

Recovery Unit).” Id.  According to the Fish and Wildlife Service, a “no jeopardy”

finding at the smallest scale of analysis results in a no-jeopardy finding at all

larger scales; if the agency found adverse effects that would appreciably reduce

recovery or survival at a smaller scale, it would conduct further analysis at the

next higher scale.  Id.

> At the local population level, the agency made the following finding:

> As proposed, implementation of the Rock Creek mine is anticipated
> to adversely impact the majority of occupied habitat in the West Fork
> and mainstem of Rock Creek and to a lesser extent habitat in the
> lower section of the East Fork Rock Creek (only a few hundred yards
> of the East Fork are partially downgradient from the mill site).
> Activities in the action area associated with the proposed mining
> operation would likely result in some mortality related to expected
> degradation caused by sediment input of aquatic habitat including
> spawning habitat, rearing habitat, and food supply and the related risk
> to all bull trout life history stages. Sediment levels are likely to
> increase over the five year construction period and could reach a level
> to cause morphological channel changes (e.g., filling of pools,
> substrate embeddedness) that reduce the quality of rearing and
> foraging habitat for bull trout. During this same period, degradation
> in the quality of spawning habitat is likely due to deposits of fine
> sediment in spawning gravels. Increases in sedimentation (total and
> fine sediment), water quality degradation, and changes in channel and
> habitat complexity related to mining activities are anticipated to result
> in reduced egg, larval, and juvenile life history stages by impairing
> feeding, breeding and sheltering patterns of adult and juvenile bull
> trout. Implementation of the proposed action is likely to reduce the
> reproduction, numbers, or distribution of bull trout within Rock
> Creek for five to seven years resulting in the local population of bull
> trout decreasing compared to existing levels.

05-107 AR 126-2 at B-87.

> The agency concluded that the extirpation of the local population in Rock

Creek is "unlikely and unanticipated."  05-107 AR 126-2 at B-87.  Nonetheless,

and without making an explicit finding as to jeopardy to the local population, the

agency proceeded to analyze the jeopardy question at the next larger scale.  The

agency explained that Rock Creek is one of 14 local populations comprising the

Lower Clark Fork Core Area, and noted that the Rock Creek population is a

"relatively minor" (less than 4 percent) contributor to the total Core Area

population.  Id.  The agency also cited the recent success of fish passage systems

at Noxon Dam as evidence that Rock Creek could be re-colonized by migratory

bull trout even if the current local population is lost.  Id.  The agency concluded:

> [A]dverse impacts to the local Rock Creek population of bull trout are
> likely, but these effects on the core area population are minor.  As a
> result, the Service concludes that implementation of this project is not
> likely to jeopardize the continued existence of bull trout at the scale
> of the Lower Clark Fork Core Area, and by extension not likely to
> jeopardize at the Clark Fork River Management Unit and the larger
> scale of the Columbia River Interim Recovery Unit.  Therefore, the
> Service concludes that this project will not appreciably reduce both
> the survival and recovery of the coterminous United States population
> of the bull trout in the wild[.]

Id. at B-88.

The Plaintiffs' attacks on the Fish and Wildlife Service's "no jeopardy"

conclusion for the bull trout are based on this Court's holding in Rock Creek

Alliance, which set aside the 2003 biological opinion.  390 F. Supp. 2d at 1011.

The Court held that the jeopardy analysis was flawed because (1) it reached a

conclusion as to the effect of the extirpation of the Rock Creek bull trout that was

contrary to an earlier biological opinion, without explaining the change; and (2)

the agency failed to consider the current status of the species "across its entire

range." Id. at 1010.  The agency endeavored to correct those shortcomings in the

2007 Supplement.  Plaintiffs say the agency's efforts are inadequate, and the

problems remain.

>           **ii.     The Fish and Wildlife Service's Consideration of the**
>           **        Bull Trout Across its Entire Range**

In Rock Creek Alliance, this Court stated, "Determining the current status

of the [distinct population segment] requires an examination of relevant

information generated in the six years since the listing, and [the agency] fails to

update the information."  390 F. Supp. 2d at 1010.

The Fish and Wildlife Service addressed this deficiency by including a well-

supported discussion of the current status of the distinct population segment in the

2007 Supplement, concluding based on the available information that "bull trout

populations throughout the Columbia River basin are at best stable and more often

declining."  05-107 AR 126-2 at B-32 to B-40.  The agency considered the

following information:

> 1) Analysis of Actions that have Undergone Section 7 Consultations;
> 2) Five-year status review (April 2005)(including core area
> assessments); 3) Draft Recovery Plan for Bull Trout; 4) Science team
> report – Bull Trout Recovery Planning: A review of the science
> associated with population structure and size (Whitesel et al. 2004);
> and 5) relevant technical reports prepared by Avista regarding the
> local Rock Creek bull trout population.

Id. at B-33.  The five-year status review assessed the "range-wide" conservation status of the bull trout for the first five years of listing and found no substantial change in the range-wide baseline conditions.  Id. at B-39 to B-40.  The agency also considered and summarized the findings of 137 biological opinions issued for the Columbia River distinct population segment from the time of listing until August 2003, and another 30 biological opinions for the Clark Fork River Management Unit from August 2003 through July 2006.  Id. at B-33 to B-39.

The Plaintiffs isolate a single sentence of the analysis, in which the agency states, "At the time of preparing this Rock Creek biological opinion we are not aware of any existing biological opinion within the range of bull trout with other than a no-jeopardy determination."  05-107 AR 126-2 at B-37.  Plaintiffs accuse the agency of improperly equating a finding of no jeopardy with a finding of no harm, but that argument fails for two reasons.  First, the agency discussed the detrimental effects of the reviewed actions in summary fashion in its analysis, and in action-by-action detail in Appendix B to the 2006 Biological Opinion.  Id. at B-34 to B-39; Appendix B.  More importantly, it is the adequacy of the discussion, not the ultimate conclusion, that the Court found lacking in Rock Creek Alliance.  Rock Creek Alliance held that while the agency's conclusion "may be justifiable," it had failed in its "procedural obligation" to examine the species across its entire range.  Id. at 1010.  The record shows the agency did not repeat that failure here.

The Plaintiffs' argument on this issue does not prevail and is wrong.

### iii. The Fish and Wildlife Service's Consideration of the Effect of Extirpation of the Rock Creek Population

The Plaintiffs hold that the 2007 Supplement's "no jeopardy" determination arbitrarily discounts the significance of the loss of the Rock Creek bull trout population. This argument requires a return to the question of scale, but this time examining the issue in the jeopardy context instead of in the critical habitat context. The agency has complicated the matter for itself where jeopardy is concerned because of its statements in earlier biological opinions relating to the risks posed to the species by the loss of a single subpopulation. 05-107 AR 126-2 at B-4.

To place the arguments in context it is necessary to consider how the Fish and Wildlife Service's classification system for analysis of bull trout recovery changed between the 2003 Biological Opinion invalidated in Rock Creek Alliance and the 2007 Supplement at issue here. The analysis in the 2003 Biological Opinion uses the following classification hierarchy:

| Name | Hierarchical Relationship |
|---|---|
| Columbia River Distinct Population Segment | One of five distinct population segments within the coterminous United States |
| Cabinet Gorge Subpopulation | One of 141 subpopulations within the Columbia River distinct population segment |

| Rock Creek Local Population | One of two local populations comprising the Cabinet Gorge subpopulation |
|---|---|

05-107 AR 126-2 at B-2 to B-13.

The classification system was changed for the 2007 Supplement to correspond to the organizational hierarchy contained in the 2002 Draft Bull Trout Recovery Plan.  05-107 AR 126-2 at B-5.  The new classification system retains the distinct population segments, but creates a new category under them called "management units" (also known as "recovery units").  Id. at B-6.  Subpopulations were generally re-designated as "core areas," and the agency began a tentative process of consolidating core areas that are currently fragmented by dams but believed to have natural and historical connectivity.  Id. at B-8, B-11.  Under this new structure, the Rock Creek local population was initially one of two local populations comprising the Cabinet Gorge core area.  Id. at B-11 to B-13.  In 2006, the Fish and Wildlife Service consolidated the Cabinet Gorge core area with three other core areas to form a single Lower Clark Fork core area.  Id.  The decision to consolidate was

> a significant acknowledgment that, due mostly to the fish passage efforts, the recovery of bull trout resources in the Lower Clark Fork have progressed to a measurable extent toward the specific recovery goal to: "ensure the long-term persistence of self-sustaining, complex, interacting groups of bull trout distributed throughout the Clark Fork River basin so that the species can be delisted." It is also a recognition that the four previously designated core areas did not, by themselves, constitute true core areas - that is, biologically

functioning units that contained all of the necessary constituent elements for the long-term security of bull trout.

Id. at B-11.

The 2007 Supplement applied the following classification system in performing its jeopardy analysis as a result of these changes:

| Name | Hierarchical Relationship |
|------|--------------------------|
| Columbia River Distinct Population Segment | One of five distinct population segments within the coterminous United States |
| Clark Fork River Management Unit | One of 23 management units in the Columbia River distinct population segment |
| Lower Clark Fork Core Area | One of 35 core areas in the Clark Fork River management unit |
| Rock Creek Local Population | One of 14 local populations in the Lower Clark Fork core area |

05-107 AR 126-2 at B-7.

In the earlier Rock Creek Alliance case, it was noted that the Fish and Wildlife Service had "repeatedly stated [in other biological opinions] that each subpopulation is crucial to bull trout survival." 390 F. Supp. 2d at 1007. The Court relied on those prior statements to reject the agency's argument that "the Rock Creek bull trout population is relatively insignificant, so even if in the worst case scenario it was extirpated, that would pose no real threat to the [distinct population segment]."[35] Id. at 1010. Rock Creek Alliance reasoned that "the

---

[35]It is important to note that in this case, as with the 2003 Biological Opinion, the extirpation of the Rock Creek bull trout population is a worst-case scenario. The agency has

simple fact of contrary conclusions [in different biological opinions] is not, without more, damning," but "a change in conclusion must be explained."  Id. Because the agency did not explain its differing conclusions across biological opinions as to the risk posed to the species from the loss of a subpopulation, the agency's conclusion was in violation of the law.  Id. at 1010-11.

The Fish and Wildlife Service has invoked similar reasoning to reach its "no jeopardy" conclusion in the 2007 Supplement, but this time the terminology is different.  The agency concludes adverse effects on the local population are likely, but that effects on the core area population will be "minor."  05-107 AR 126-2 at B-88.  As a result, the agency finds that "this project is not likely to jeopardize the continued existence of bull trout at the scale of the Lower Clark Fork Core Area, and by extension not likely to jeopardize at the Clark Fork River Management Unit and the larger scale of the Columbia River Interim Recovery Unit."  Id. Plaintiffs argue that, new terminology aside, the agency has yet again contradicted its earlier statements without providing a satisfactory explanation for the change.

The 2007 Supplement presents two explanations for the change.  The first explanation relates to the process by which biological opinions issued during a certain time period contained differing conclusions with regard to the risk posed by the possible extirpation of a subpopulation.  The agency writes:

_____

concluded that extirpation is unlikely and unanticipated.  05-107 AR 126-2 at B-87.

The Court pointed out that some previously issued biological opinions contained language that indicated the loss of a bull trout subpopulation would cause jeopardy to the DPS, and asked for further explanation of why the Service departed from this position in the 2003 Rock Creek biological opinion. In response to the Court's remand, our evaluation substantiated the Court's conclusion that some biological opinions were issued with this language while others were not. During preparation of the 2003 Rock Creek biological opinion, we were made aware through an email message from Region-1 of the Service that Region-1 had drafted an approach to jeopardy analyses which was intended to be used to address section 7 consultation until the Draft Recovery Plan was finalized (2/2/01 email from John Young, FWS, Portland Regional Office; see email attachment marked draft; Appendix A in this opinion is a copy of this email). The email message discussed the importance of a subpopulation to the DPS and the attachment was a document marked "Draft," that contained language that was proposed to be used in the Status of the Species section of biological opinions addressing effects to bull trout (see Appendix A). This proposed draft language stated that loss of a subpopulation "constitutes an unacceptable risk to the DPS," which has been interpreted and incorporated into some biological opinions as meaning the "loss of a subpopulation would cause jeopardy to the DPS." Because this was "draft" language, we did not use this language in the 2003 biological opinion, and in fact, recognized that the language may not be applicable to circumstances for the Rock Creek mine project and other situations in Montana (see below). However, as the Court found, other offices did use this draft language in their biological opinions for actions affecting bull trout resulting in an apparent inconsistency among biological opinions. Consequently, we requested updated information in an email to Region-1 (email to John Young, Portland Regional Office, 5/20/05). The response from Region-1 stated *"In light of new information available since the 1998 listing that has been incorporated into the draft Recovery Plan, which has been provided for public and agency comment on two occasions, and subjected to two separate peer reviews, my position is that it is now inappropriate to base bull trout conservation status and conservation requirement conclusions on the subpopulations identified in 1998."* Additionally, the Service has since discontinued the use of "subpopulation" terminology as a unit of analysis for jeopardy determinations as explained below.

05-107 AR 126-2 at B-3 to B-4.

The second explanation given by the agency is that the consolidation of four core areas into the Lower Clark Fork core area was warranted due to historical connectivity, the goals of the Draft Bull Trout Recovery Plan, and the recent successes of the AVISTA fish passage systems.  The agency explains that the four consolidated core areas did not individually satisfy the Draft Bull Trout Recovery Plan's definition of core area because they did not contain "all of the necessary constituent elements for the long-term security of bull trout."  05-107 AR 126-2 at B-11.  Under the Draft Bull Trout Recovery Plan, connectivity between the consolidated areas is deemed necessary for long-term maintenance of the bull trout.  Id. at B-13.  Because fish passage efforts have begun to restore this connectivity, the agency concludes, consolidation into the Lower Clark Fork core area was appropriate.  Id. at B-11.

The Plaintiffs challenge the agency's reliance on the fish passage systems to explain the "no jeopardy" finding.  AVISTA's Fish Passage/Native Salmonid Restoration Program is mandated by a 1999 Federal Energy Regulatory Commission Settlement for the Cabinet Gorge and Noxon Rapids Dams.  05-107 AR 126-1 Appendix D at 1.  The program intends to re-establish upstream connectivity for bull trout using a "trap and haul" operation to carry bull trout over the dams.  Id.  Adults are moved upstream for spawning, while juveniles are

moved downstream for rearing.  05-107 AR 126-2 at B-9.  From 2001 to 2005, the

program successfully passed 174 adult bull trout upstream.  AR 126-1 Appendix D

at 1.  During the same time the program captured 1,249 juveniles and either

transported them downstream or tagged them and allowed the to volitionally

migrate.  Id.  The agency estimates that 15 to 20 percent of bull trout redds found

in the Lower Clark Fork core area were "likely constructed from fish that were

passed over the dams."  Id. at 2.  According to the 2007 Supplement, the fish

passage program is "well-funded with full-time dedicated staff to implement the

trap and transport of bull trout for the entire 45-year licensing period."  05-107 AR

126-2 at B-9.  In 2004, the Fish and Wildlife Service documented ten migratory

bull trout in the Rock Creek drainage, including two fish that the agency's

biologists conclude "likely spawned."  08-28 AR 5562-63.[36]

Relying on this information the 2007 Supplement states:

In conclusion, it is now evident that a significant level of functional connectivity has been reestablished in the Lower Clark Fork. Neither the upstream nor the downstream passage programs have been fully developed, but it is anticipated that gains in efficiency will continue, given the documented successes thus far and the major commitments of resources already in place.

05-107 AR 126-2 at B-11.

Plaintiffs contend the Fish and Wildlife Service's reliance on the AVISTA

---

[36]References to the Administrative Record in the consolidated case are in the following format:  08-28 AR [Bates number].

fish passage program is arbitrary and capricious because AVISTA Utilities

disputes the agency's conclusions with respect to the effectiveness of the program.

In a December 22, 2006, letter, AVISTA Utilities outlines its objections to the

Fish and Wildlife Service's scientific conclusion and states, "To date there is

insufficient data supporting the contention that downstream passage has had any

effect."  08-28 AR 1309-10.

The Court is not positioned to decide whether AVISTA or the agency has

the better scientific basis for their respective views the effectiveness of the fish

passage program.[37]  The question of deference comes in to play in considering this

bone of contention.  The Fish and Wildlife Service determined that the success of

the fish passage program, coupled with the historic natural connectivity of the

consolidated areas, provides sufficient grounds for consolidating the four core

areas into the Lower Clark Fork core area.  That scientific determination is entitled

to deference, and should not be questioned on the basis of AVISTA's

disagreement alone.  Marsh, 360 U.S. at 377.

The Fish and Wildlife Service provided the explanation that was lacking in

the 2003 Biological Opinion by justifying its large scale analysis and resulting "no

jeopardy" conclusion in a way that rationally explains the difference between its

---

[37]Revett implies that AVISTA has financial incentives to downplay the effectiveness of
its costly fish passage program.  Doc. No. 107 at 14.

discussion of the importance of the local population here and its discussion of the importance of the subpopulation in pre-2003 biological opinions.  The agency anticipates some reduction in the numbers of Rock Creek bull trout, but not extirpation.  It found the harm to the local bull trout population would not result in jeopardy to the Columbia River distinct population segment because the Rock Creek population is so relatively small that the damage will not register at the core area, management unit, or distinct population segment levels.  That conclusion is rationally based on the facts found.

The problem is that such reasoning does potentially leave the species subject to "death by a thousand pinpricks," as the Court put it in the earlier <u>Rock Creek Alliance</u> case.  Even so, the agency has addressed the Court's concerns in this case with its expanded review of the current status of the species across its range.  Moreover, the Plaintiffs do not challenge the sufficiency of the agency's cumulative impacts analysis in their briefing, seemingly choosing instead to stake their claim on the hope that the Court will continue to bind the agency to statements made in years-old biological opinions and based on an organizational hierarchy that has since been replaced and a method for analytical guidance that has been disavowed.  The Plaintiffs' argument is unpersuasive.  The Fish and Wildlife Service and Revett are entitled to summary judgment against the Plaintiffs on Count II in the consolidated case alleging ESA Section 7 violations

with respect to bull trout.

> 5.   **Grizzly Bear (Count I, Consolidated Case)**
>
> > a.   **Background on Effects of the Mine Project on Grizzly Bears and the "No Jeopardy" Determination**

The Cabinet-Yaak Ecosystem grizzly bear population is one of four remaining populations of the listed species, and is "essential to long-term survival and recovery of grizzly bears throughout a significant portion of its range in the United States." 05-107 AR 126-1 at A-10. The population is estimated at 30 to 40 bears, putting it at "high risk for extinction." Id. at A-10, A-16. A recovered population in the Cabinet-Yaak would require at least 100 grizzly bears. Id. at A-11. The survival of female grizzlies is "the most important element for recovery of the [Cabinet-Yaak] grizzly bear population." Id. at A-16. In 2005, the six-year average for female mortality in the Cabinet-Yaak was five times higher than the Recovery Plan limit. Id. The Ecosystem consists of two sections, the Cabinet Mountains in the south and the Yaak River drainage in the north, joined by two narrow corridors of habitat. Id. at A-11. The Cabinet Mountains section, where the Rock Creek Mine would be located, supports a population of 15 or fewer grizzlies based on the most recent reliable estimate. Id. at A-12. The latest analysis indicates a 91-percent probability that the Cabinet-Yaak population is in decline. Id. at 13. Under current conditions it is difficult to imagine how any

action that results in anything other than a net improvement for grizzly bears can

survive scrutiny under the ESA.

The Fish and Wildlife Service estimates that of the 15 bears occupying the

Cabinet Mountains, five are females of reproductive age.  05-107 AR 126-1 at A-

24 to A-25.  Of those five females, two or perhaps three "may have home ranges

within the action area."  Id. at A-25.  This Court has previously held that "given

the clear possibility that bears are at least not increasing, contemplating the loss of

additional bears related to the mine is not rational."  Rock Creek Alliance, 390 F.

Supp. 2d at 1008.  The Forest Service responded by amending its mitigation plan

to include an augmentation plan that requires construction of the mine to be

deferred until at least six female grizzly bears are relocated to the Cabinet

Mountains.  08-28 AR 1195.  The six augmented females are intended to offset the

expected loss of one reproductive female as a result of the mine project; due to

variables of survival and age at the time of relocation, agency biologists concluded

"three to six" females would need to be augmented to account for the loss of a

single female.  05-107 AR 126-1 at A-92.

The Fish and Wildlife Service expects the action on the mine project to

displace of female grizzly bears:

> We anticipate that at some time during the 30-year life of the mine,
> most likely during the 5-year construction phase, one to two adult
> female grizzly bears may be displaced to the point where their
> reproduction is impaired. In other words, females may not breed or

> complete a pregnancy during a breeding cycle due to lack of adequate nutrition or stresses associated with displacement. We do not anticipate that this impairment would be permanent. We do not anticipate that this level of disturbance would result in the death of cubs, subadult or adult bears.

05-107 AR 126-1 at A-67.  To compensate for the loss of habitat caused by the action, a mitigation plan has been established requiring that 2,450 acres of replacement habitat be acquired or secured through conservation easements.  Id.

The mine project will alter 483 acres, but it will disturb an additional 6,561 acres based on the Forest Service's assumption that bears will avoid an area extending a quarter- to a half-mile  around altered sites and roads (called the "influence zone"), resulting a total area of 7,044 acres.  Those acres will be under-used.  05-107 AR 126-1 at A-51.  The Fish and Wildlife Service then noted that of that area, 5,729 acres are already under-used due to 73 acres of existing roads and the 5,656 accompanying acres of influence zone, and concluded that displacement from existing under-used habitat will not be considered an effect of the proposed action.  Id. at A-52.  For the remaining 1,315 acres that are not currently under-used but will be as a result of site development, the agency applied a compensation multiplier ranging from 70 percent to 100 percent.  Id.  If the displacement is expected to be such that the affected habitat will lose 100 percent of its ability to support grizzlies, the acreage must be replaced at a 1:1 ratio.  Id.  If instead the habitat lost only 70 percent of its value, for example, the corresponding

replacement habitat need only contain 70 percent of the acreage of the lost parcel. Id. All developed sites were assigned a 100 percent multiplier, with lesser numbers used for influence zones.  Id.

The application of the multipliers indicated that 1,218 acres of mitigation habitat must be acquired to offset the newly-under-used 1,315 acres resulting from mine development.  05-107 AR 126-1 at A-52.  The agency then took into account that although it would not hold the existing 73 acres of roads and 5,656 acres of influence zone against Revett, it would require some additional mitigation acreage to account for the added disturbance (and under-use) caused by increased use of existing roads due to the Mine.  Id. at A-53.  Based on its assumption that increased use would lower the influence zone's ability to support grizzlies by 20 percent, the agency required the acquisition of additional acreage equal to 20 percent of existing 5,656-acre under-used influence zone, or 1,131 acres.  Id.  It added those 1,131 acres to the 1,218 acres needed to compensate for new mine development, for a total of 2,349 acres, and then rounded up to 2,350.  Id. at A-52. The final 100 acres of mitigation habitat is required to help offset "potential fragmentation of grizzly bear habitat in a north to south corridor along the Cabinet Mountains, east of the divide."  Id. at A-51.  Thus, the total mitigation habitat to be acquired is 2,450 acres.  The acreage is to be acquired according to the following acquisition schedule:

| Phase | Activity Area | Acres | Timing |
|-------|---------------|-------|--------|
| 1 | Evaluation Adit | 153 | Prior to Adit Construction |
| 2 | Tailings & Associated Features | 806 | Prior to Construction |
| 2 | Mill & Associated Features | 248 | Prior to Construction |
| 2 | Ventilation Adit | 10 | Prior to Construction |
| 2 | New Roads | 102 | Prior to Construction |
| 2 | Existing Roads (reconstruction) | 565 | Prior to Reconstruction |
| 2 | Existing Roads (increased use) | 566 | Prior to Operations |

Id. at A-5.  The Fish and Wildlife Service and the Forest Service must jointly approve each mitigation parcel before purchase, "ensuring that they each contribute to offsetting the impacts of the proposed Rock Creek Mine."  Id. at A-56.

The 2006 Biological Opinion concludes that the Rock Creek Mine as proposed is not likely to jeopardize the continued existence of grizzly bears.  05-107 AR 126-1 at A-101.  The Fish and Wildlife Service states:

> [C]ollectively, the measures would reduce, remove, or more than offset the potential adverse effects of the proposed action....  The Service concludes that the combination of the actions required in the proposed action and mitigation plan would eliminate the likelihood that the proposed action itself would appreciably diminish survival and recovery of grizzly bears, and would in fact improve conditions over the long-term over the existing conditions, ultimately promoting the recovery of the [Cabinet-Yaak] grizzly bear population.

Id. at A-102.

**b.    The Plaintiffs' claims**

Plaintiffs insist the 2006 Biological Opinion violates Section 7 of the ESA because (1) the agency based its "no jeopardy" finding on acquisition of mitigation parcels that the Plaintiffs say is unlikely to occur; and (2) the agency acted arbitrarily when it discounted for existing developments in calculating the amount of habitat displacement caused by the mine, but failed to discount for existing developments that will exist in the acquired mitigation parcels.

### i.       Future Acquisition of Mitigation Property

Plaintiffs complain that the Fish and Wildlife Service improperly relied upon a mitigation plan that allows for the final 566 acres of mitigation habitat to be acquired after construction of the Mine is complete but prior to the start of operations.  This Court considered and rejected this very argument in <u>Rock Creek Alliance</u>, 390 F. Supp. 2d at 1009.[38]  There summary judgment for the Fish and Wildlife Service was granted on the grounds that Section 7(d) did not impose constraints on that agency, but rather prohibited the *Forest Service* from making an irreversible or irretrievable commitment of resources during consultation.  390 F. Supp. 2d at 1009.  <u>Rock Creek Alliance</u> went on to state that the argument fails under Section 7(a)(2) as well:  "In any case, [the Fish and Wildlife Service] is

---

[38]Revett contends the Plaintiffs' argument is barred by the doctrine of collateral estoppel because the Plaintiffs raised it in <u>Rock Creek Alliance</u>.  The Plaintiffs rightly point out that because the Rock Creek Alliance opinion resulted in a remand to the agency, they had no opportunity to appeal any aspects of the ruling that were adverse to them.  Plaintiffs say they raise the issue again here both to preserve an appeal and to ask the Court to reconsider the matter in light of intervening Ninth Circuit authority in <u>National Wildlife</u>.

right that Southwest Center controls—it is permissible that the mitigation lands

are not yet bought and even that there might be some difficulty."

    In Southwest Center for Biological Diversity v. United States Bureau of

Reclamation, the Ninth Circuit upheld a biological opinion that relied on

mitigation measures that included the future acquisition of unidentified mitigation

parcels.  143 F.3d 515, 518-19, 523 (9th Cir. 1998).  The panel stated:

> [U]nder the ESA, the Secretary was not required to pick the first
> reasonable alternative the FWS came up with in formulating the RPA.
> The Secretary was not even required to pick the best alternative or the
> one that would most effectively protect the Flycatcher from jeopardy.
> The Secretary need only have adopted a final RPA which complied
> with the jeopardy standard and which could be implemented by the
> agency.

Id. at 523 (internal citation omitted).

    The Plaintiffs ask the Court to reconsider its earlier holding in light of the

National Wildlife opinion.  In National Wildlife, the circuit held the National

Marine Fisheries Service improperly relied upon "a sincere general commitment"

by the action agency to make future efforts to mitigate the effects of the operation

of dams.  524 F.3d at 936.  Before the ESA consulting agency may rely upon

future mitigation efforts, the panel held, there must be "solid guarantees" in the

form of a "clear, definite commitment of resources."  Id.

    Plaintiffs say the Fish and Wildlife Service considered the final 566 acres of

mitigation habitat without a solid guarantee that the habitat will ever be acquired

because the acquisition schedule allows for the mine to be constructed before the

mitigation acreage is secured.  Plaintiffs' reliance on <u>National Wildlife</u> is

misplaced, because there are significantly better guarantees here.  Revett may not

conduct any operations, and therefore will not begin to realize any return on its

investment, until the final 566 acres have been acquired.  05-107 AR 126-1 at A-5.

Plaintiffs do not question the sufficiency of Revett's resources, and the record

shows Revett has already begun to successfully devote those resources to

mitigation habitat acquisition.  08-28 AR 2572, 05-107 AR 126-1 at A-106.

In the event Revett does not acquire the last 566 acres and the mine is

abandoned, the Plaintiffs say the result will be "cold comfort" for the grizzlies

who have been displaced by the development.  Doc. No. 127 at 10.  This argument

fails to account for the absence of increased traffic over existing roads in such a

scenario.  No operating mine means no increased traffic and no resulting

displacement, which the agency calculated at 1,131 acres.  05-107 AR 126-1 at A-

53.

Plaintiffs next reason that due to "immense political and economic

pressures," the agencies, and by implication this Court, will lack the will to

enforce the mitigation plan's terms, calling the prospect of the forced

abandonment of the constructed mine "not credible."  Doc. No. 127 at 10.[39]  The

argument is specious and baseless in fact and in logic.  There is no basis,

particularly in light of the litigation history of this project, to infer that the

agencies or this Court will countenance a violation of the Terms and Conditions of

the 2006 Biological Opinion.  05-107 AR 126-1 at A-113 (requiring

implementation of the mitigation plan "as proposed" for Revett and the Forest

Service to be exempt from the ESA Section 9 prohibition on take).  A future ESA

Section 9 claim for unauthorized take looms low on the horizon should the

agencies forgive or set aside the obligation to acquire the final 566 acres.  As this

Court stated, "[T]his is the risk Revett takes, especially by not accumulating the

property early in the game.  The risk that the agency may not prevail to acquire

mitigation lands must be borne by the project, not by the endangered species."

Rock Creek Alliance, 390 F. Supp. 2d at 1010 (internal quotation marks omitted).

The Plaintiffs' argument is rejected on this point.

#### ii.     The Agency's Calculation of Mitigation Acreage

---

[39]Revett agrees that it is not credible to believe it will abandon the mine after construction, but not for the reasons Plaintiffs cite.  The company states,

> Revett's acquisition of all required mitigation habitat is certain to occur.  It is simply not credible that, after years of litigation, Revett would eventually construct the mine and then walk away, never having operated the mine, never having recouped its investment, for want of the final 566 acres of mitigation habitat.

Doc. No. 107 at 20.

The Plaintiffs' final argument relates to the manner in which the mitigation habitat acreage requirement is calculated.  The agencies used the discounting process described above so that Revett would not be held responsible for acreage that is already under-used due to existing development.  The Plaintiffs complain that the mitigation plan fails to similarly apply a discount factor to account for existing development in the mitigation parcels that are eventually acquired.  The contention is that the agency's failure to apply a discount factor to unidentified mitigation habitat violates the APA because the agency "failed to consider an important aspect of the problem."  Doc. No. 86 at 14.

To support their argument, Plaintiffs cite the Declaration of Sarah Olimb. Doc. No. 86-3.  Olimb used Geographic Information Systems (GIS) mapping to show what percentage of the parcels identified as potential mitigation parcels contain under-used habitat due to existing improvements and the associated quarter-mile influence zones.  Id. at 2-3.  She concluded from the GIS mapping that even after taking into account road closures to be implemented if certain parcels be acquired, the 17 potential mitigation parcels identified contain 6313.3 acres of habitat that is currently under-used due to existing development.  Id. at 18.

Revett moves to strike the Declaration.  As a general rule, courts review agency action based only on the information before the agency at the time of the decision.  Southwest Center For Biological Diversity v. United States Forest

Service, 100 F.3d 1443, 1450 (9th Cir. 1996).  Under the four recognized

exceptions to the rule, extra-record documents are permitted (1) if necessary to

determine whether the agency has considered all relevant factors and has

explained its decision; (2) when the agency has relied on documents not on the

record; (3) when supplementing the record is necessary to explain technical terms

or complex subject matter; and (4) upon showing of agency bad faith.  Id.  The

first exception applies here.  The Olimb Declaration is based on information about

the potential mitigation parcels that are in the record, but includes displacement

calculations based on roads and the associated influence zones (using the agency's

criteria) to arrive at an acreage number that is not in the record.  The declaration

can be considered to determine whether the agency has accounted for the existence

of under-used habitat in the potential mitigation parcels.  Revett's motion to strike

is denied.[40]

The ESA contains no substantive requirement that habitat be replaced in

such a manner, particularly in a case such as this where there is no critical habitat

designated for the species.  This means the Plaintiffs' argument in relation to

discounting has to assume that the Fish and Wildlife Service based its "no

_____

[40]The Court initially granted the motion to strike (Doc. No. 112) by Order dated
November 24, 2009 (Doc. No. 190), on the ground that Plaintiffs had failed to respond.
Plaintiffs later alerted the Court to their Response in the record, and were allowed  to move for
reconsideration.  Doc. No. 191.  Thus, to deny Revett's motion to strike, the Court will grant
Plaintiffs' motion for reconsideration (Doc. No. 196) and order the docket to reflect that the
Olimb Declaration (Doc. No. 86-3) will be considered by the Court.

jeopardy" finding on the belief that the mitigation plan would provide for replacement of habitat on an acre-for-acre basis.  The record does not support that assumption.

The agency stated that "replacement habitat acquisition would contribute further to offsetting the long-term disturbance effects of the mine."  05-107 AR 126-1 at A-68.  Elsewhere the agency made clear that replacement habitat would not entirely make up for all habitat lost due to under-use when it explicitly acknowledged that "[e]ach acquisition (or protection through easement) of privately-owned grizzly bear habitat would not necessarily increase the amount of habitat available to grizzly bears, because some private lands are undeveloped and currently available to bears."[41]  Id. at A-55.  The agency also acknowledged the presence of improvements on potential mitigation parcels, and explains how acquisition of those properties, accompanied by road closures where possible, has the potential to "improve conditions on more acres than the mitigation properties alone" by eliminating means of access to adjacent lands.  Id.

It is inaccurate for the Plaintiffs to hold that the 2006 Biological Opinion "overlooked a critical aspect of the 'replacement' calculation."  Doc. No. 127 at 8.  The agency directly addressed all aspects to the mitigation habitat calculation and

---

[41]The agency went on to explain that such parcels are nonetheless assigned a high priority for acquisition due to the likelihood that they will be developed in the future if they remain in private hands.  05-107 AR 126-1 at A-55.

explained how the acquired mitigation parcels combined with several other significant mitigation measures to support the agency's "no jeopardy" determination.  These measures include: management of road and trial access (05-107 AR 126-1 at A-74); management of attractants (Id. at A-75); information and education programs (Id. at A-76); funding for enhanced monitoring and research (Id. at A-80); measures to reduce habitat fragmentation (Id. at A-87 to A-90); and augmentation through the introduction of six female bears (Id. at A-92).  The agency describes these measures and their intended effects in detail, and explains how they collectively support the "no jeopardy" finding in a rational way.  Id. at A-101 to A-108.

Plaintiffs do not directly assail the rationality of the "no jeopardy" conclusion, attempting instead to undermine the agency's reasoning by isolating a single aspect of the mitigation plan and arguing on the margins about how much stock the agency placed in it.  The argument is incomplete as well as inaccurate. Plaintiffs' argument on this matter is rejected, and summary judgment is granted in favor of Revett and the Fish and Wildlife Service and against the Plaintiffs on Count I in the consolidated case alleging ESA Section 7 claims related to the grizzly bear.

## 6.    ESA Section 9 (Count II, lead case)

Because the Plaintiffs offered no briefing on this claim, and because the

Plaintiffs will not prevail on their ESA Section 7 claims, summary judgment is granted in favor of Revett and the Fish and Wildlife Service and against the Plaintiffs on Count II in the lead case alleging a claim under ESA Section 9. This ruling does not preclude any future ESA Section 9 claims alleging take of a listed species without a valid exemption.

## IV. Conclusion

For the foregoing reasons, the parties' motions are resolved as set forth in the Court's March 29, 2010, Order (Doc. No. 213), and the Clerk of Court is directed to enter judgment in accordance with Doc. No. 213 and to close the case file.

Dated this _____ day of May, 2010.

16:32 pm

Donald W. Molloy, District Judge
United States District Court